# United States Court of Appeals
## For the First Circuit

No. 11-1129

UNITED STATES,

Appellee,

v.

CHARLES TURNER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Thompson, Circuit Judges.

Charles W. Rankin, with whom Michelle Menken and Rankin & Sultan were on brief, for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

July 11, 2012

**LYNCH, <u>Chief Judge</u>**.  A federal jury convicted Charles Turner of one count of attempted extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951, and three counts of making a false statement in violation of 18 U.S.C. § 1001.  Turner, at the time of his trial and since 2000, was a member of the Boston City Council.  The indictment charged Turner with making false statements to FBI agents and accepting $1,000 in exchange for performing official acts to assist a local businessman in obtaining a liquor license for a planned supper club in the Roxbury neighborhood of Boston.  That businessman, Ronald Wilburn, was in fact cooperating with the FBI.

Turner's appeal challenges his convictions and his sentence.  As to the Hobbs Act count, he argues both (1) that the district court's jury instructions on two elements (reciprocity and interstate commerce) constituted plain error, so he is entitled to a new trial, and (2) there was insufficient evidence to satisfy those same two elements and so he is entitled to a judgment of acquittal on that count.  He does not seek a judgment of acquittal on the three false statement counts.  Turner also argues he is entitled to a new trial based both on purported errors in the admission of certain evidence and on the prosecution's closing argument.  Finally, Turner challenges his thirty-six month sentence based on a contention that the government impermissibly sought vindictively to punish him.

We affirm Turner's convictions, deny his requests for a new trial, and affirm his sentence.

I.

The evidence presented at trial is described in the light most favorable to the jury's guilty verdict.  See United States v. Manor, 633 F.3d 11, 12 (1st Cir. 2011).

In early 2007, before he began working with the FBI, Ronald Wilburn was attempting to secure needed local government permission to open a supper club called Déjà Vu at the Crosstown Development Center in the Roxbury neighborhood of Boston.  Sales of alcohol were to be a large portion of the club's revenue.  Wilburn turned to two local elected officials for support: state Senator Diane Wilkerson and Councillor Turner; the Crosstown project was in the districts each represented.  Wilburn applied for an all-alcohol license[1] from the Boston Licensing Board ("Board") in January 2007 and supported his application with a letter from Turner.  The letter was prepared by Wilburn's lawyer and signed by Turner; Turner was not paid for the letter.  Wilburn had a hearing before the Board in March 2007.  In April the Board rejected his application because, it said, the location was not conducive to having a supper club and because the venue was too large.  Wilburn

---

[1] There were two types of liquor licenses discussed at trial. One was a beer and wine license, the other an all-alcohol license, which allows the holder to sell all kinds of alcohol, including beer, wine, cordials, and hard liquor.  Wilburn sought the latter, which is also called an "A" license.

submitted a new floor plan to the Board in May or June of 2007, but the Board did not change its decision.

The FBI had received information that Wilburn and a business associate had made payments to Senator Wilkerson in exchange for her help with an earlier business venture and in obtaining a lease for the supper club space at the Crosstown project. The FBI approached Wilburn with this information, and Wilburn began working with the FBI in late February 2007. At the request of the FBI, Wilburn met with Wilkerson on five occasions, starting on June 5, 2007, and offered her money in exchange for her assistance in securing an all-alcohol license for his Crosstown project supper club. Wilburn made two cash payments -- $500 and $1000 -- to Wilkerson in June 2007.

After these payments, Wilkerson began working at both the state and local levels to secure the license for Wilburn. One such effort was an e-mail she sent on June 28, 2007, to some members of the Boston City Council, including Turner, asking for a hearing on the subject of liquor licenses. Her e-mail explained that of sixty liquor licenses recently granted to the City of Boston by the Massachusetts legislature, none had gone to businesses in the Dorchester and Roxbury portions of an "Empowerment Zone" in Boston. Her e-mail singled out two applications from those neighborhoods: one was Wilburn's for the Déjà Vu supper club in Roxbury, and another was for a restaurant in Dorchester called "Poppa B's."

-4-

Turner responded positively to Wilkerson's e-mail the next day. His purported reason for seeking to hold hearings on the denial of liquor licenses was to investigate issues raised by liquor licenses not going to establishments in the Empowerment Zone. During a conversation between Wilkerson and Wilburn in early July 2007, Wilkerson stated that Turner "was going to help out and talk to the right people" and that he was going to set up a city council hearing.

On July 10, 2007, Turner filed an order with the city council requesting a hearing "to discuss the decision making process that led to the denial of licenses in an area of the Empowerment Zone in need of economic development." The order was co-sponsored by several other city councillors and specifically mentioned the Crosstown Development, where Wilburn planned to locate his supper club. The order was introduced in the city council on July 11, 2007, and referred to the Economic Development and Planning Committee, chaired by Councillor Linehan.

After Turner's positive response to Wilkerson's e-mail, the FBI asked Wilburn to meet with Turner "to feel him out to see if he was so inclined, as Senator Wilkerson was, to accept money on behalf of official acts." Wilburn agreed.

Wilburn first met with Turner in his Boston City Hall office on July 25, 2007. At this time the city council hearing on the denial of liquor licenses in the Empowerment Zone which Turner

had requested had not yet been scheduled. During this meeting, which was captured by a recorder Wilburn wore, Wilburn thanked Turner for his support of Wilburn's liquor license application. Turner said that he already "knew [Wilkerson] was working with" Wilburn on the matter of the liquor licenses. Turner told Wilburn that he had "everything set up to have a hearing." Turner also connected himself to Wilkerson, saying he did not yet want to set a date for the hearing "without her saying, yeah, that fits her strategy." Turner asked whether Wilburn and Wilkerson were still "interested in going forward," and Wilburn indicated that they were. The men discussed the issue of the licenses further, then while Wilburn waited Turner called Senator Wilkerson's and Councillor Linehan's offices to set a date for the hearing. Even though the hearing would involve several attendees, Turner only coordinated schedules with Linehan, whose committee the hearing would be before, and with Wilkerson, but not with anyone else.

During this July 25 meeting, Wilburn told Turner four separate times that he wanted to hold a fund-raiser for Turner to thank him for his support. Turner thanked him and they discussed a location for the fund-raiser -- a club in Roxbury called "Slades" -- and they talked about a time: a Saturday afternoon around 3:00 P.M. Turner said that "would be wonderful" and gave Wilburn his wife's phone number to coordinate the fund-raiser.

On August 2, 2007, at the direction of the FBI, Wilburn met with Wilkerson in a restaurant near the State House and gave her another payment of $1,000. This payment, captured on videotape, was in exchange for her performing official duties to help get Wilburn a liquor license.

The next morning, August 3, 2007, Turner called Wilburn at his home and asked Wilburn to come to Turner's Roxbury district office later that day to talk about the liquor license. Wilburn reported this phone call to the FBI agent handling the case, and the agent outfitted Wilburn with an audio/visual recording device and gave him $1,000 in fifteen bills to give to Turner at the meeting. This phone call was not recorded. Wilburn testified that his daughter was at home at the time he received the call and that he did not use the recording equipment because he did not want her to know he was working with the FBI. At trial, Turner denied that he made the call.

That afternoon, Wilburn arrived at Turner's Roxbury office and waited to speak with Turner. Turner's office was fairly small, and Wilburn testified that when he did get to speak to Turner there were other people within earshot, so he "really couldn't say what [he] wanted to say."

Wilburn told Turner that he had "[h]eard some good things about" Turner. Wilburn then said, "I wanted to do something for you and your wife and I talked to Diane [Wilkerson], again this

morning. I think we talked about that. . . . I met with her and, uh, about the hearing that you're gonna be doing." Turner responded with affirmative "Mm-hmm's." Wilburn also said, "I'm really grateful because it's really hard to get somebody to stand up for you in a fight and I just wanted to stop by and just . . . give you, take your wife out to do dinner and do something nice." To which Turner replied, "Oh, that'd be, yup."

The two men went on to discuss scheduling issues regarding the hearing on the denial of liquor licenses. Turner and Wilburn then had the following exchange:

> Wilburn: I told [Wilkerson] that I'd talk to you and, I was gonna stop by and show my gratitude.
> Turner: Mmm-hmm.
> Wilburn: And then, you know, after the hearing, I want to show my gratitude again.

At this point in the conversation, Wilburn handed Turner the $1,000 in fifteen bills given to him by the FBI agent earlier in the day. The jury watched a video of the handover of the cash, recorded by a concealed camera that Wilburn wore. In the foreground is Wilburn's hand holding rolled-up money. Wilburn then passes the rolled-up money to Turner, who takes the money in his hand without looking down.

The exchange continued:

> Turner: Hey, (unintelligible).
> Wilburn: You know, so . . .
> Turner: Like that.

```
Wilburn:  You, you take the wife to dinner
          and . . .
Turner:   All right.
Wilburn:  and, and, and, uh, have some fun.
Turner:   Okay.
```

(Ellipses in original.)  The two men then discussed Wilburn's plans to resubmit his liquor license application to the Board.

Later in the same conversation, Wilburn and Turner had this exchange:

```
Wilburn:  And, and I just want you to know
          that, you know, you take care of me,
          I take care of you.
Turner:   Hey.
Wilburn:  And this is, what you have is my
          gratitude.
Turner:   [Unintelligible.]  All right.
Wilburn:  Okay?  And I'll talk to you after the
          hearing.
Turner:   Okay.
Wilburn:  And we'll set something else up and
          we'll go ahead.
Turner:   Yeah.  Sounds like fun.
```

At trial, Wilburn testified that when he said, "[Y]ou take care of me, I take care of you," he meant, "Help me get the license, and I help you out" by giving Turner "money."  The two then exchanged phone numbers.

During this conversation Turner had continued holding on to the rolled-up cash and shifted it from his right hand to his left hand.  When he opened a green composition book to write down Wilburn's phone number, he did so with his thumb and index finger of his left hand, the money clutched in his fist.  Turner and Wilburn then talked some more about the details of the Crosstown

project and had the following exchange as the conversation came to a close:

> Wilburn: But a, again, your, your support has been tremendous . . .
> Turner:  Mm-hmm.
> Wilburn: . . . and I'll talk to you, uh, before the hearing.
> Turner:  Hey.
> Wilburn: And I'll talk to you after the hearing.
> Turner:  All right.
> Wilburn: And we'll set up and I'll take care of you again.
> Turner:  All right.  Take care.

(Ellipses in original.)

After this August 3 payment of $1,000, Turner never contacted Wilburn to speak about the money Wilburn gave him or to give the money back. Wilburn's comments made it clear this was not a campaign contribution, that they would talk before and after the hearing, and after the hearing Wilburn would "take care of [Turner] again." Further, Turner did not ever characterize this $1,000 as a campaign contribution or list it on his disclosure forms. He testified that he knew the campaign finance laws and knew that he could not accept cash donations over $50 or donations in any form from a single individual over $500 in a given year.

The following week, on August 8, 2007, Turner left Wilburn a recorded voice message updating him on his efforts in regard to the hearing. Turner's message informed Wilburn that the hearing could not take place on August 15 as planned due to

scheduling problems. But Turner assured Wilburn that the hearing would be rescheduled.

In late July and early August, while Turner was working on scheduling the city council hearing on liquor licenses, Wilkerson was also making progress on getting Wilburn his liquor license. Wilkerson had been in contact with a man named Arthur Winn regarding Wilburn's liquor license, and Winn in turn put Wilburn in contact with an attorney named Steven Miller. Miller told Wilburn that for a fee of $1,500, he would "pass [Wilburn's liquor license application] on to Daniel Pokaski," who was chairman of the Boston Licensing Board at the time, "and not to worry about it." Wilburn paid Miller the $1,500 with money given to him by the FBI.

The plan was for Wilburn to accept a beer and wine license at first, and then later he would receive an all-alcohol license. The idea was that this would be done through a plan under which the state legislature would grant additional liquor licenses to the City of Boston through a "Home Rule" petition. The whole deal was contingent on making sure that the city council hearing Turner had been planning did not take place. Given these changes, Wilburn and the FBI determined that it would not be in Wilburn's interests to go forward with Turner's planned city council hearing on the denial of liquor licenses. Wilburn testified at trial: "[W]e didn't need a hearing. All we needed was a liquor license."

On August 13, 2007, Wilburn telephoned Turner and recorded the conversation. Wilburn told Turner that he had talked to Wilkerson and told her that he was willing to accept the beer and wine license and wait for the all-alcohol license because "that would be the best way for us to proceed." Turner initially responded that he was going ahead with the hearing because he wanted to put a "spotlight" on the licensing issue. Wilburn asked Turner whether, if "they" could find an all-alcohol license for Wilburn's supper club right away, Turner would then withdraw his hearing request. Turner responded by telling Wilburn that "if they really would like the hearing not to take place . . . and they can give you an [all-alcohol] license . . . I would be willing to pull back on the hearing." Turner eventually agreed to postpone his city council hearing on the subject of denial of liquor licenses. That hearing never took place. Wilburn received a beer and wine license on August 15, 2007.

The "Home Rule" petition providing for new liquor licenses for the City of Boston was brought before the city council on September 12, 2007. On that day Wilburn, again outfitted by the FBI with recording devices, went to City Hall to meet with Turner. The plan was for Wilburn to offer Turner a second cash payment, this one of $600. Before meeting with Turner, Wilburn spoke with Turner's secretary at Turner's City Hall office, and she asked him

if he had money. Wilburn told her he did not. The secretary then brought Wilburn to meet Turner.

Wilburn thanked Turner for his vote in favor of the Home Rule petition and suggested they have lunch together later in the week because Wilburn had "a little something to give" Turner. They made plans for lunch, Turner asked for Wilburn's phone number, and the men parted without Wilburn's having given Turner the $600. Wilburn testified that he did not give Turner the $600 that day because he had already told Turner's secretary that he did not have money with him, and she was standing close by during his conversation with Turner. Turner did not call Wilburn after their September 12 meeting at City Hall, and the two men did not meet for lunch as they had discussed or have any further contact.

On October 31, 2007, Déjà Vu received an all-alcohol license from the Licensing Board after Pokaski and Miller, the attorney, got in touch. This license was not attributable to the Home Rule petition that passed the Boston City Council, as that petition was still pending in the state legislature at this time. The Home Rule petition eventually died in the state legislature. Turner did not call for any hearings on the subject of denial of liquor licenses or a new Home Rule petition.

The FBI continued its investigation of Wilkerson for about a year. On October 27, 2008, the government filed a complaint against Wilkerson, and the next morning the FBI arrested

her and executed search warrants, served subpoenas, and conducted interviews with persons involved in the investigation, including Turner. FBI agents Cowley and Keelan met with Turner that morning at his City Hall office.

The agents told Turner that Wilkerson had been arrested earlier that morning on public corruption charges. They told him the charges stemmed from her taking money in exchange for performing acts in regard to a liquor license issue. Turner agreed to speak with the agents. He told them that Wilkerson had contacted him regarding a proposed restaurant in the Crosstown Development that had been denied a liquor license because of what she believed was racial bias. Turner said he suggested holding a city council hearing to examine how liquor licenses are distributed, and he recounted the various officials with whom he had discussed the issue. He said that he talked with Wilkerson on the phone two to four times about the issue.

Turner told the agents that he had concluded that racial bias was not a factor in the decision not to grant the license applications, and that he eventually concluded there was no need to hold a hearing after Wilkerson informed him that she was moving forward with the Home Rule petition to obtain more liquor licenses for Boston. Turner told the agents that he may have spoken to one of the principals of the Crosstown Development restaurant on the

phone, but that they never had an in-person meeting and he could not remember the man's name.

Asked whether Turner knew Ron Wilburn, Turner said Wilburn's name sounded familiar, but he did not know him. After being shown a photograph of Wilburn, Turner said he may have seen Wilburn in the community, but he did not know him. In response to a series of direct questions about Wilburn, Turner told the agents that Wilburn had never offered him anything and never offered to hold a fund-raiser for him, that he had never had a meeting with Wilburn and had never met him, and that Wilburn had never offered him any money or paid him any money.

Turner checked his computer's calendar for a record of any meeting with Wilburn and told the agents he did not find any. At this point Turner became agitated and told the agents that the FBI was a racist organization. In his testimony, Turner himself characterized this as a "diatribe." After the agents finished their line of questioning, Turner asked them whether anyone other than Wilkerson's attorneys had access to or could read the charges against her. The agents told him that the charges would be made public and then they left Turner's office.

Later that day, Turner called Agent Cowley and berated her, accusing the agent of setting him up and violating his civil rights.

II.

On April 7, 2009, a federal grand jury returned a second superseding indictment against Turner and Wilkerson.[2]  Turner was charged with one count each of conspiring to commit extortion under color of official right and of attempted extortion under color of official right, both in violation of the Hobbs Act, 18 U.S.C. § 1951, and with three counts of making false statements in violation of 18 U.S.C. § 1001.  The conspiracy charge was dropped on motion of the government before the jury was sworn.

The attempted extortion under color of official right count was based on Turner's course of conduct, particularly his accepting $1,000 in cash from Wilburn during the August 3, 2007, afternoon meeting at his Roxbury office and events before and after that.  The three false statement counts were based on Turner's statements to the FBI agents at the October 28, 2008, interview in his City Hall office that (1) he had never accepted money from Wilburn, (2) Wilburn had never offered to hold a fund-raiser for him, and (3) Wilburn had never offered him money or any other assistance.

---

[2]  On June 3, 2010, Wilkerson pled guilty to eight counts of attempted extortion under color of official right, and the government dismissed the remaining conspiracy and theft of honest services fraud charges against her.  The district court sentenced Wilkerson to forty-two months' imprisonment, to be followed by three years' supervised release.  Her sentence was affirmed on appeal.  United States v. Wilkerson, 675 F.3d 120 (1st Cir. 2012) (per curiam).

-16-

Turner's jury trial began on October 18, 2010, and lasted through October 28. The defense argued that Turner's scheduling, and then cancelling, a city council hearing on the subject of liquor licenses were not in exchange for any money Wilburn may have given him but rather were legitimately done by Turner as a public official. Turner testified that holding hearings was part of his job and that he was concerned about the fact that none of the sixty liquor licenses recently provided by the state legislature were given to establishments in the Empowerment Zone in his district.

The defense sought to discredit Wilburn's testimony and the video evidence of Wilburn's cash payment to Turner on August 3. The defense argued that Wilburn could have given Turner something less than $1,000 and pocketed the rest for himself. Turner testified that the reason the video shows him not looking down when Wilburn hands him the money is that it was not uncommon for his constituents to hand him small contributions and it would have been "rude" and "disrespectful" if he had examined what Wilburn had given him. Turner called this a "preacher's handshake."

He also testified that he did not remember the August 3 meeting at all and that if he had received $1,000 from anyone, he would have remembered it. In contrast with these failures of memory as to his several meetings and conversations with Wilburn, Turner had a clear memory of a five-minute conversation he had with Pokaski in June 2007 on the reasons for the rejection of Wilburn's

application.    Turner testified that neither at the time the FBI agents interviewed him at his City Hall office on October 28, 2008, nor at trial did he remember ever meeting Wilburn, Wilburn's offering to hold a fund-raiser for him, or accepting any money from him.

On October 29, the jury returned a verdict of guilty on all four counts.[3]    On January 25, 2011, the district court sentenced Turner to three years in prison, to be followed by three years of supervised release.    At sentencing, the district court found that Turner had committed perjury during his testimony. Turner timely filed his appeal on February 3, 2011.

III.

The Hobbs Act, 18 U.S.C. § 1951, makes it a crime for anyone to "obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do," id. § 1951(a), and it defines extortion as, among other things, "the obtaining of

---

[3]  After his conviction but before his sentencing, the Boston City Council removed Turner from office.  Turner sued the city, the city council, and city council members in federal district court under 42 U.S.C. § 1983, alleging that his ouster violated his First and Fourteenth Amendment rights.  The district court certified questions to the Massachusetts Supreme Judicial Court ("SJC"), Turner v. City of Boston, 760 F. Supp. 2d 208 (D. Mass. 2011), which held that the city council lacked the authority under state law to remove Turner from office before he had been sentenced. Turner v. City of Boston, 462 Mass. 511 (2012).  Turner's § 1983 suit in the district court has not yet been resolved.

property from another, with his consent, . . . under color of

official right," id. § 1951(b)(2).

Turner challenges his conviction for attempted extortion

under color of official right on two main grounds: instructional

error and insufficiency of the evidence.  He argues that the

district court's jury instructions on the reciprocity and

interstate commerce elements constituted plain error, so he is

entitled to a new trial, and that there was insufficient evidence

to satisfy those two elements.  His appeal also raises evidentiary,

closing argument, and sentencing issues.

A.          Hobbs Act: The Reciprocity Element of Extortion Under
            Color of Official Right

Hobbs Act extortion under color of official right

prosecutions fall into two categories: campaign contributions[4] and

other payments. Turner does not argue that this is a campaign

contribution case.

Outside of the campaign contribution context, the Supreme

Court set the requirement in Evans v. United States, 504 U.S. 255

(1992), that "the Government need only show that a public official

---

[4]  The Supreme Court in McCormick v. United States, 500 U.S.
257 (1991), held that a public official's acceptance of payments
that are treated as campaign contributions is a violation of the
Hobbs Act "only if the payments are made in return for an explicit
promise or undertaking by the official to perform or not to perform
an official act."  Id. at 273.  That is, "a specific quid pro quo
is necessary for conviction under the Hobbs Act when an official
receives a political contribution."  United States v. Cruzado-
Laureano, 404 F.3d 470, 482 (1st Cir. 2005).

has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  Id. at 268. The Court also held that "the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the quid pro quo is not an element of the offense."  Id.

The Evans Court did not directly state that proof of at least an implicit, as opposed to an explicit, quid pro quo or reciprocity understanding is necessary.  However, both Justice Kennedy in a concurrence and three other justices in a dissent recognized that the Evans majority's opinion pointed toward such a requirement.  See id. at 272 (Kennedy, J., concurring); id. at 285-86 (Thomas, J., dissenting).  Since Evans, other circuits, using the language of quid pro quo or variations on that term, have held that "a quid pro quo [is] required to sustain a conviction in the non-campaign context, but that the agreement may be implied from the official's words and actions."  United States v. Ganim, 510 F.3d 134, 143 (2d Cir. 2007); see also, e.g., United States v. Kincaid-Chauncey, 556 F.3d 923, 937 (9th Cir. 2009); United States v. Antico, 275 F.3d 245, 258 (3d Cir. 2001); United States v. Giles, 246 F.3d 966, 972-73 (7th Cir. 2001); United States v. Collins, 78 F.3d 1021, 1035 (6th Cir. 1996); United States v. Martinez, 14 F.3d 543, 553 (11th Cir. 1994).

The Supreme Court has not had the occasion to address this since Evans. The parties and the district court accepted that implied reciprocity or quid pro quo is a requirement in non-campaign contribution cases and we too accept that proposition for purposes of this case, without deciding the issue. The disputes here are rather about whether the jury instructions adequately described the reciprocity concept, under the pertinent standard of appellate review, and about whether the evidence sufficed.

1.      Jury Instructions on the Reciprocity Element

The district court instructed the jury that it must find beyond a reasonable doubt the following:

> First, that on or about August 3, 2007, Mr. Turner knowingly and willfully obtained cash from Mr. Wilburn;
> Second, that Mr. Turner obtained that cash under color of official right as a public official;
> Third, that Mr. Turner knew that the cash to which he was not entitled was obtained in return for official acts . . . .

After discussing knowledge and willfulness, the court elaborated:

> Let me turn to this idea of color of official right. The statute, which covers a broad range of activities, much of which is unrelated to anything that you have to consider, calls it Extortion Under Color of Official [R]ight when a public official has obtained or attempted to obtain a payment to which he is not entitled knowing that the payment was offered to him in return for taking or withholding or influencing official acts.

The Government does not need to show that Mr. Turner made some specific threat or used force or fear to cause a person to tender the money that the Indictment alleges he obtained. The Government does not need to prove that the defendant made any particular request or demand for money or engaged in some affirmative inducement to obtain the money. Passive acceptance of a benefit by a public official is sufficient if the official knows that he is being offered or tendered the payment in exchange for the exercise of his official power.

The Government is not required to prove that the defendant made some specific promise that he was going to perform some particular act at the time of the payment. What the Government must prove is that Mr. Turner received a payment he was not entitled to receive with knowledge that the payment was provided to him in exchange for some official act. It is not necessary for the Government to show that that act was actually taken or actually occurred.

Ultimately, the Government does not have to prove -- and I tell you what the Government does not have to prove so you understand what it is that they do have to prove. The Government does not have to establish that the defendant had the ultimate authority to guaranty or deny or influence actions such as the issuance of a liquor license all by himself, or to schedule or cancel City Council hearings on his own or to pass City Council resolutions on his own. But the Government must establish that the defendant in his official capacity had the power to facilitate government business, and it was that power, that power to facilitate, that he was paid to exercise.

The Government does not have to prove that the defendant had the specific intent to take the official action at the time the payment was made, but the Government must prove that he intended to accept the payment fully knowing that it was being tendered to take such official action. That is what the

-22-

statute means when it talks about Extortion
Under the Color of Official Right.

In his briefs on appeal, Turner's argument was that the district court's instructions inadequately instructed the jury on the reciprocity element generally. At oral argument, Turner reframed his objection to an argument that the instructions could have been understood by the jury as not requiring a finding that Turner had impliedly promised to take official actions in return for the $1,000 Wilburn paid him. Turner argues that the instructions would have allowed the jury to convict Turner on the Hobbs Act count even if it found that the $1,000 was a mere gratuity. Both iterations of the argument were not raised with the district court. Accordingly, review is for plain error.[5] See United States v. Troy, 618 F.3d 27, 33 (1st Cir. 2010). But since there was no error at all, the argument fails even if the objection had been preserved.

The district court's jury instructions track the language of Evans, which we have repeatedly endorsed. We have repeated the Evans language that "the Government need only show that a public official has obtained a payment to which he was not entitled,

_____

[5] Turner argues that the issue should be considered properly preserved under United States v. Sawyer, 85 F.3d 713 (1st Cir. 1996), where we excused the defendant's failure to object to a jury instruction in part because the defendant did make a number of other preserved objections to the court's instructions that "were closely related" to the unpreserved argument he made on appeal. Id. at 742. The arguments here are not closely related.

-23-

knowing that the payment was made in return for official acts." United States v. Rivera Rangel, 396 F.3d 476, 484 (1st Cir. 2005) (quoting Evans, 504 U.S. at 268) (internal quotation marks omitted). In United States v. Cruz-Arroyo, 461 F.3d 69 (1st Cir. 2006), we said: "To establish guilt for extortion under color of official right, the prosecution must show only that the defendant, a public official, has received an emolument that he was not entitled to receive, with knowledge that the emolument was tendered in exchange for some official act." Id. at 73.

In keeping with these cases, the district court stated that the jury must find that "Mr. Turner knew that the cash to which he was not entitled was obtained in return for official acts" (emphasis added). Later, the court instructed the jury: "The statute . . . calls it Extortion Under Color of Official [R]ight when a public official has obtained or attempted to obtain a payment to which he is not entitled knowing that the payment was offered to him in return for taking or withholding or influencing official acts" (emphasis added). The district court also instructed: "What the Government must prove is that Mr. Turner received a payment he was not entitled to receive with knowledge that the payment was provided to him in exchange for some official act" (emphasis added). This "in return for" and "in exchange for" language is directly from Evans and our precedents.

-24-

In this context, "return" is defined as "something given to repay or reciprocate." Webster's Third New International Dictionary 1941 (1993). "In return for" thus means "in repayment or reciprocity for." Similarly, "in exchange" means "as payment." Id. at 792. So when the court instructed the jury that it must find that Wilburn offered Turner the $1,000 "in return for taking or withholding or influencing official acts," the jury understood that it had to find that the money was offered "in repayment or reciprocity for" Turner's "taking or withholding or influencing official acts." This sufficiently conveys the essence of reciprocity.

Turner's arguments to the contrary ignore the meaning of both the phrases "in return for" and "in exchange for," which conveyed the requirement that the jury find that the $1,000 was given to Turner as payment, which in turn means "something given to discharge a debt or obligation or to fulfill a promise." Id. at 1659. This is incompatible with the idea of, as Turner puts it in his brief, "a gratuity, with no strings attached."

Further, the instructions were clear that

> [t]he Government does not have to prove that the defendant had the specific intent to take the official action at the time the payment was made, but the Government must prove that he intended to accept the payment fully knowing that it was being tendered to him to take such official action.

(Emphasis added.) Similarly, the court instructed the jury that "the Government must establish that the defendant in his official capacity had the power to facilitate government business, and it was that power, that power to facilitate, that he was paid to exercise" (emphasis added). These instructions did not allow the jury to convict if they found only that the payment was no more than a "thank you" offered in gratitude for something already done. Rather, contrary to Turner's argument, the instructions required the jury to find that Turner knew the payment was tendered "to take" an official action or "to exercise" an official power; that is, to do something for Wilburn after he received the payment.

Read as a whole, the instructions adequately conveyed to the jury the requirement that they find Turner promised to undertake ongoing action in exchange for the $1,000.

The government's theory was that when Wilburn's payment of the $1,000 was accepted on August 3 by Turner (and not returned), it reflected Turner's understanding that he was being paid for his ongoing support using his city council position for Wilburn's as yet unsuccessful liquor license application. The government did not need to prove that Turner did in fact take steps thereafter to do what he had been paid to do. Even so there was evidence from which a jury could conclude that Turner did in fact take those steps. He agreed to cancel the hearing on denial of licenses in the area of Roxbury although earlier he had said the

-26-

hearings were not just about Wilburn, but also the larger issue of possible race discrimination.  He did so because Wilburn, having paid Turner for Turner's ongoing services, asked him to do so.  The government, to be clear, did not argue that Turner had solicited the money.

The defense closing stressed that the government had not met its burden.  Defense counsel stated in his closing: "The crime of Attempted Extortion Under Color of Official Right is completed when a public official receives a payment that he was not entitled to receive with knowledge that the payment was provided in exchange for some official act."  The defense was that Turner was a busy public servant with a poor memory who did not make the phone call to Wilburn on August 3, 2007, inviting Wilburn to Turner's Roxbury office, and was just "trying to do his job."  The theory was that the reason Wilburn gave money to Turner was so he could pocket some for himself.  No theory was ever presented that the jury must acquit because the $1,000 was merely a "thank you" gesture made for official actions Turner had already performed.  Nevertheless, that theory has been introduced on appeal, and fails on its merits.

Turner also argues that even if the instructions contain accurate statements of the law, certain of the court's statements regarding what the government did not have to prove overshadowed everything else.  Turner's argument here relies on taking portions of the court's instructions out of context.  The district court

told the jury that it was instructing them on "what the Government does not have to prove so you understand what it is that they do have to prove." After each of the statements cited in Turner's brief in which the court told the jury what the government did not have to prove, the court followed up immediately with an accurate statement of the law as to what the government did have to prove. Read as a whole, as we must do, these instructions properly conveyed the requirement that the jury find that Turner knew that the cash he received was given to him in return (or exchange) for a promise to take official actions on Wilburn's behalf.

Although he did not seek this instruction at trial, Turner argues on appeal that the district court erred in failing to give an instruction that he must have at least understood that he was "expected to exercise some influence on the payor's behalf as opportunities arose." United States v. Abbey, 560 F.3d 513, 518 (6th Cir. 2009). Some circuits have used this or similar language to state that the quid pro quo may be implicit rather than explicit. See, e.g., United States v. Coyne, 4 F.3d 100, 114 (2d Cir. 1993) ("[W]e have held since Evans that the government does not have to prove an explicit promise to perform a particular act made at the time of payment. Rather, it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence -- i.e., on behalf of the payor -- as specific opportunities arise."

-28-

(citation omitted)). Turner's argument fails for a variety of reasons, including that this information was conveyed in effect.

In fact, the district court gave an instruction substantively identical to the one Turner now requests when it told the jury that "[t]he Government is not required to prove that the defendant made some specific promise that he was going to perform some particular act at the time of the payment," but that jury had to find that "Turner received a payment he was not entitled to receive with knowledge that the payment was provided to him in exchange for some official act."

In sum, there was no error in the instructions on the reciprocity element, much less was there plain error. The instructions adequately explained the law and did not tend to confuse or mislead the jury on the controlling issues, so they were not an abuse of discretion. And they were appropriate to the factual circumstances of the case, contrary to Turner's argument.

2. <u>Sufficiency of the Evidence on the Reciprocity Element</u>

Turner argues that even if the instructions were adequate, there was insufficient evidence as to the reciprocity element to support a conviction. Turner made and renewed a Rule 29 motion, so the challenge to the sufficiency of the evidence is reviewed de novo, with the proof viewed in the light most favorable to the guilty verdict. <u>Cruz-Arroyo</u>, 461 F.3d at 73.

At the August 3 meeting, Wilburn repeatedly said that the $1,000 payment was an expression of his "gratitude" to Turner. On appeal, Turner uses these statements to argue that the $1,000 was merely a gratuity and that there was insufficient evidence that Turner agreed to perform ongoing official acts for Wilburn. There is strong evidence to the contrary, and the jury's verdict was amply supported.

We start with Wilburn and Turner's statements at that August 3 meeting and their actions after the payment. At the August 3 meeting, as Wilburn handed Turner the $1,000, he said: "after the hearing," which was still to take place, "I want to show my gratitude again" (emphasis added). The jury could have reasonably understood Wilburn to be telling Turner that the $1,000 of "gratitude" being handed over was in fact an inducement for Turner to promise to use his office to advance Wilburn's efforts to obtain a liquor license, and that by accepting the cash Turner implicitly made that promise. The jury could reasonably have concluded that Wilburn was telling Turner (and that Turner understood) that another payment would be forthcoming after Turner fulfilled his implicit promise to hold the liquor license hearing.

Wilburn also told Turner: "I just want you to know that, you know, you take care of me, I take care of you." He also said: "I'll talk to you, uh, before the hearing. . . . And I'll talk to you after the hearing. . . . And we'll set up and I'll take care of

-30-

you again." Turner's response was: "All right." Turner accepted the implicit deal for his future official acts; he did not reject the deal, nor did he reject or return the money. See Evans, 504 U.S. at 274 (Kennedy, J., concurring) ("The official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it.").

Turner's actions after this August 3, 2007, meeting provide further support for the jury's verdict. On August 8, 2007, Turner made a phone call to Wilburn to assure him that even though the hearing date set had to be cancelled due to a scheduling conflict, the hearing would still take place later. And on August 13, 2007, Wilburn called Turner to get the hearing cancelled because it might interfere with his efforts to obtain a liquor license by other means. Turner ultimately agreed to cancel the hearing at Wilburn's request, on the condition that Wilburn would receive the all-alcohol license he was seeking. This was so despite the fact that Turner's original purported purpose in holding the liquor license hearings was to bring to light the fact that liquor licenses were not being properly apportioned by the Board to the Empowerment Zone, a problem that would not have been remedied by a deal providing just Wilburn with a license. But as

Wilburn testified at trial: "[W]e didn't need a hearing. All we needed was a liquor license." The jury could have easily inferred that Turner's continuing to make sure that Wilburn's ultimate goal of getting an all-alcohol license was realized was evidence that Turner had implicitly agreed to help him reach that goal when he took the $1,000 on August 3, 2007.

The jury also had evidence of Turner's concealment of the crime and consciousness of guilt, which supported its verdict on the Hobbs Act count. See United States v. Romero-Carrion, 54 F.3d 15, 17 (1st Cir. 1995) (evidence of defendant's consciousness of guilt supported guilty verdict). The jury heard the testimony of the two FBI agents who interviewed Turner in his City Hall office on October 28, 2008. During that interview Turner denied that Wilburn had ever offered to hold a fund-raiser for him or offered him any money or paid him any money. Turner even denied ever having met Wilburn. From having seen and heard the recordings of Wilburn and Turner's meetings, the jury knew these denials were false.

Turner told the agents that he eventually concluded there was no need to hold a hearing on the denial of liquor licenses because Wilkerson informed him that she was moving forward with the Home Rule petition to obtain more liquor licenses for Boston. But he testified at trial that he did not learn about the Home Rule petition until after he agreed to cancel the hearing at Wilburn's

request.  Similarly, he told the agents that he did not move forward with the hearing because he had determined that racial bias did not play a part in the denial of Wilburn's liquor license application, but at trial he testified that he had decided to go ahead with the hearing even though he was satisfied that the Board had rejected Wilburn's application for legitimate reasons.

This evidence not only went to Turner's guilt on the false statement counts.  It was also evidence that Turner knew he was guilty of the crime of accepting money in exchange for promising to perform official acts on Wilburn's behalf and was trying to cover up that guilt by lying to the FBI agents.

Turner's own testimony at trial provided further evidence of his guilty conscience.  He testified that he could not remember meeting with Wilburn and accepting the $1,000 Wilburn passed to him, even after hearing the other witnesses' testimony and watching the video of the transaction.  This is in contrast to his clear recollection of a five-minute phone conversation he had with Pokaski regarding the reasons why the Board denied Wilburn's liquor license application.

Turner was asked directly on cross-examination whether the $1,000 he had received from Wilburn "was an exchange of money for service, right?  That's what happened here?"  His answer was: "I have no way of saying, so I can't answer the question, because

I don't remember what happened, and the picture doesn't answer that question for me."

When asked about the roll of fifteen bills constituting the $1,000 he was handed, he said he did not look down because it was like a "preacher's handshake," and it would be rude to look down at the money.  And when asked how he knew what was handed to him was money if he did not look down, Turner then said he did not know it was money and it would be rude to look down at any gift.

Turner's testimony was so incredible that at sentencing the district court found "beyond a reasonable doubt" that Turner had perjured himself.

B.        Hobbs Act: The Interstate Commerce Element of Extortion Under Color of Official Right

There was no error in the district court's instruction on the jurisdictional element.  To meet the jurisdictional requirement of the Hobbs Act, "the government need show only that the conduct created a 'realistic probability' of a minimal effect on interstate commerce."  United States v. Brennick, 405 F.3d 96, 100 (1st Cir. 2005) (quoting United States v. Capozzi, 347 F.3d 327, 335 (1st Cir. 2003)).  This minimal effect has been described by our precedent as "a de minimis effect," Capozzi, 347 F.3d at 335 (quoting United States v. Butt, 955 F.2d 77, 80 n.2 (1st Cir. 1992)), and we have upheld an instruction that the jury must find the activity in question to have had a "minimal, slight or subtle effect" on interstate commerce, Butt, 955 F.2d at 80 n.2.

-34-

1.      <u>Jury Instructions on the Jurisdictional Element</u>

Turner's specific claim of error is that the district court's instructions suggested that it sufficed for the jury to find a connection between liquor licenses and interstate commerce and did not require it to further find that Turner was "interfering with" liquor licenses.

Turner admittedly did not object at trial to the court's jury instructions on the interstate commerce element, so the instructions are reviewed for plain error only. <u>Troy</u>, 618 F.3d at 33. Here, there was no error at all.

The district court correctly instructed the jury that the interstate commerce element could be satisfied by proof that there was "the prospect, the realistic prospect, that there [was] going to be some interference with or alteration in the movement of product in interstate commerce" and that "[t]he actual potential effect on interstate commerce can be minimal" or "minor or slight."

The district court also correctly instructed the jury on the required "nexus" between the defendant's actions and the effect on interstate commerce. The district court told the jury: "[T]he government must prove that the natural consequence of the <u>defendant's conduct</u>, as he understood the circumstances to be, potentially could have caused an impact on interstate commerce, however minor or slight" (emphasis added). With this language the court clearly and correctly instructed the jury that they had to

find that any effect on interstate commerce was a "consequence of the defendant's conduct."

Turner takes issue with the court's next statement that

> you will consider whether or not the use of liquor for a liquor license and for a nightclub or a supper club is something that could interfere with the interests of the proposed business . . . . And if you find that it is, . . . then you may find that this interstate-nexus element has been met.

Turner argues that this instruction could be read as stating that the interstate commerce element could be met merely by finding a connection between liquor licenses and interstate commerce. Not so. The court's immediately preceding statement, that the jury must find a connection between the defendant's conduct and interstate commerce, made it clear that the jury was told that it had to find both that Turner's conduct affected liquor licenses and that this effect on liquor licenses affected interstate commerce.

There was no error, let alone plain error.

2.      Sufficiency of the Evidence on the Jurisdictional Element

Ample evidence supports the jury's conclusion that the interstate commerce element was met, in that Déjà Vu's receipt of a liquor license would affect interstate commerce. The jury heard testimony that a liquor license was necessary for the success of Wilburn's supper club and that the liquor sold there would travel in interstate commerce.

Actions affecting the availability to a business of a liquor license affect interstate commerce. In <u>United States</u> v. <u>McKenna</u>, 889 F.2d 1168 (1st Cir. 1989), the defendants were officials in the Somerville city government who drafted and passed a Home Rule petition setting aside liquor licenses for an area of the city in which a hotel and bar would be built, in return for which they received cash from the project's developers. <u>Id.</u> at 1170. The <u>McKenna</u> defendants were also evidently instrumental in getting the Home Rule petition approved by the Massachusetts legislature. <u>Id.</u> We stated that

> [i]t is all but undeniable that a business with a liquor license would do business in interstate commerce. It follows that where the home rule petition facilitated, albeit remotely, the availability of a liquor license, a jury could find that the petition had a realistic probability of affecting interstate commerce.

<u>Id.</u> at 1172.

There was also sufficient evidence that Turner's "conduct created a 'realistic probability' of a minimal effect on interstate commerce." <u>Brennick</u>, 405 F.3d at 100 (quoting <u>Capozzi</u>, 347 F.3d at 335). There was evidence that after the payment Turner continued to arrange for a city council hearing on the subject of liquor licenses going to the Empowerment Zone. Turner's hearing order specifically mentioned the Crosstown Development in which Wilburn planned to locate his supper club. Given this evidence and the discussions between Turner and Wilburn in which Turner clearly

-37-

expressed an intention to help Wilburn obtain a liquor license for the supper club, the jury could reasonably find beyond a reasonable doubt that Turner's conduct created a realistic probability of a minimal effect on interstate commerce.

C.      Evidentiary Issues

Turner also argues on appeal that he is entitled to a new trial based on errors in the admission of evidence.  He is not.

We review the district court's decision whether to admit or exclude evidence for abuse of discretion, United States v. Phoeun Lang, 672 F.3d 17, 23 (1st Cir. 2012), and an erroneous admission on a preserved ground is reviewed under the harmless error doctrine, United States v. Roberson, 459 F.3d 39, 49 (1st Cir. 2006).

1.      Wilburn's Conversation with Agent Robbins

Without objection, Wilburn testified that after Turner called him on the morning of August 3, 2007 -- the day Wilburn made the $1,000 payment to Turner -- he told an FBI agent about the call.  He told the FBI agent that he thought the meeting with Turner might be in connection with a payment Wilburn had made to Wilkerson the day before and that Turner might, as a result, take a bribe at the meeting.  The FBI agent agreed that Turner might take a bribe and outfitted Wilburn with listening devices and gave him $1,000.

The government relied on this testimony in its closing for two propositions. First, that it was Wilburn's idea to offer Turner the money, not the FBI's. And second, that the August 3, 2007, phone call, which was not recorded, actually occurred.

Turner argues that these statements were inadmissible hearsay and were impermissibly used to persuade the jury that Wilburn's suspicion that Turner would accept a bribe was true and that Turner implicitly solicited the payment before the August 3, 2007, meeting took place.

Wilburn's testimony about his conversation with the FBI agent regarding the phone call was properly admitted; there was no error, and so no plain error. Wilburn's statement that he thought Turner might accept a bribe was admissible to explain why the agent gave Wilburn the $1,000 to pay Turner that day. See United States v. Bailey, 270 F.3d 83, 87 (1st Cir. 2001) (a statement "offered to show the effect of the words spoken on the listener (e.g., to supply a motive for the listener's action)" is not hearsay (quoting United States v. Murphy, 193 F.3d 1, 5 n.2 (1st Cir. 1999))).

This was relevant: that Turner called Wilburn to invite him to his office and that Wilburn in turn suggested to the FBI that Turner might accept a bribe were relevant to rebutting Turner's claim that the FBI had set him up. Cf. United States v. Benitez-Avila, 570 F.3d 364, 369 & n.1 (1st Cir. 2009) (inadmissible evidence of investigators' good faith basis for

-39-

investigating the defendant might have become relevant and therefore admissible had the defendant attempted to impeach the government's evidence by suggesting that the agents were motivated by bias or mistake).

Turner's argument that the government used this testimony to argue that Turner somehow implicitly solicited the $1,000 before the August 3 meeting is not true. The government in its closing explicitly stated that it was not relying on a theory that Turner had induced or suggested the bribe.

2.    Wilburn's Conversation with Turner's Secretary at City Hall

Wilburn testified, over objection, that while Turner's secretary was taking Wilburn to meet Turner, the secretary asked Wilburn whether he had any money and Wilburn said no. After Wilburn testified that he met with Turner but did not give him the $600, the government asked why he did not do so. Again over objection Wilburn testified: "Because I thought that there was some conversation about him [i.e., Turner] taking money, and he had talked to her and said if I came in, do not take any money. I mean, that's how I felt, and that's what I saw." At a later sidebar Turner re-raised his objection to Wilburn's testimony and the court ruled that the testimony was "not hearsay, and there was adequate foundation, and it is for notice in the general rule of things." The challenge is reviewed for abuse of discretion. Benitez-Avila, 570 F.3d at 367.

-40-

The secretary's question to Wilburn whether he had any money was admissible to show why Wilburn did not offer Turner the $600 that day. See Bailey, 270 F.3d at 87 (testimony offered to supply motive and not for its truth is not hearsay). There was no error.

Wilburn's testimony that he "thought that there was some conversation about [Turner] taking money, and [Turner] had talked to [Turner's secretary] and said if I came in, do not take any money" is another matter. This was surmise, even if intelligent surmise. There was no evidence that such a conversation between Turner and Turner's secretary took place. Wilburn's testimony lacked foundation. Fed. R. Evid. 602 (2010) ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").[6]

The government cites to no case law but argues that the statement was admissible because it somehow rebutted a defense that Wilburn was motivated by his own financial needs. We do not see the connection, nor would that overcome the fact that this was sheer speculation.

_____

[6] The government argues that Wilburn's testimony had an adequate foundation because Wilburn knew that he had paid Turner $1,000 on August 3, so he could testify about why the situation was different on August 12, when he failed to pay the $600. This argument does not go to foundation at all.

In all events, even if the admission of this portion of Wilburn's testimony was error, it was harmless. "The admission of improper testimony is harmless if it is highly probable that the error did not influence the verdict." <u>United States</u> v. <u>Casas</u>, 356 F.3d 104, 121 (1st Cir. 2004).

> [A] harmlessness determination demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue.

<u>Id.</u> (quoting <u>United States</u> v. <u>Sepulveda</u>, 15 F.3d 1161, 1182 (1st Cir. 1993)) (internal quotation marks omitted).

Wilburn's speculative testimony did nothing to affect the properly admitted testimony regarding the central issues in the case: the $1,000 payment and Turner's ongoing efforts in return to help Wilburn get his liquor license. It was clear to the jury that Wilburn was speculating and did not know one way or another. And, as the defense brought out at trial, there was a perfectly reasonable basis for the secretary's statement: political contributions of any amount were not allowed in City Hall.

More than that, the totality of the evidence, especially the evidence of Turner's lies and his own testimony, strongly supported the verdict. Because it is highly probable that

-42-

Wilburn's challenged testimony did not influence the verdict, the error was harmless.

> 3. <u>Agent Cowley's Testimony About Turner's State of Mind</u>

On the afternoon of October 28, 2008, after FBI Agent Cowley and another agent interviewed Turner in his City Hall office, Turner called Cowley and expressed to her that he was upset about the interview that morning. On cross-examination, defense counsel asked Cowley, over objection, about Turner's tone during the phone call. The following exchange took place:

```
Defense:  And by the nature of his tone, wasn't
          it clear that he didn't know anything
          about what you were talking about?
Cowley:   When I interviewed him?
Defense:  When he made the phone call, when he
          said, You set me up, what's this
          stuff about an affidavit and City
          Hall and all this?
Cowley:   Oh, no.  I think he knew he got
          caught, and that's why he was upset,
          not because I set him up.
Defense:  Excuse me.
COURT:    Just a moment.  Just a moment.  The
          question was asked; the answer can be
          completed.
Defense:  The answer just --
COURT:    The answer is responsive to the
          question that was asked.
Defense:  It only asks for a yes or no.
COURT:    I have now ruled on it.  Have you
          completed your answer?
Cowley:   Well, I just want to clarify the
          question.  I believe the question was
          it wasn't from the tone that he
          didn't know anything about Ron
          Wilburn.  No, I don't believe that
          was the case at all.  I believe the
          tone -- he was upset that after he
          had read the Complaint Affidavit,
```

-43-

> that he saw that there was videotape
> of him, and that's what he was upset
> about.  That's what I believe he was
> upset about, not that he didn't know
> anything about Ron Wilburn.
> Defense:  But that's what you believe.
> Cowley:   You asked me what I thought.  Yes,
> that's what I believe.
> Defense:  No.  I asked you about the tone of
> his voice.

Turner did not move to strike the testimony and so did not preserve any objection to an answer he elicited.  However, because the government on appeal has treated Turner as having made an appropriate objection, we deal with the issue.  The government argues that any error was harmless.

The admission of the statement was harmless because it was elicited by the defense and, in our view, harmless anyway. United States v. Rivera-Rivera, 477 F.3d 17, 20 (1st Cir. 2007) (defendant "cannot persuasively complain about the admission of this evidence, given that it was the defense -- not the government -- which elicited it in the course of its cross-examination"); see also United States v. Lizardo, 445 F.3d 73, 84 (1st Cir. 2006) (where the defendant elicited challenged testimony on cross-examination, he could not "contest his own invited error" on appeal).

D.       The Government's Closing Argument

During his closing argument, the prosecutor made this statement about the meeting between Turner and the FBI agents on October 28, 2008: "And then the agents decide it's time to ask the

-44-

tough questions. Do you know Ron Wilburn? The magic blank goes over Chuck Turner's face, and he knows at that moment that the gig is up, that he's caught." Turner argues that this is factually inaccurate because Turner only became upset later in the interview, when he began searching his calendar for any mention of Wilburn.

There was no error here: Turner's premise is wrong. The prosecutor's argument that Turner knew he was caught was not based on Turner's change in mood later in the interview, but rather on Turner's purported memory loss as to his repeated interactions with Wilburn. The prosecutor was asking the jury to infer that Turner had a guilty conscience from the fact that he lied to the investigators. Turner is further incorrect in arguing that the prosecutor's statement was in any way related to Agent Cowley's testimony, discussed above, that Turner was upset later that day because he knew he had been caught: the prosecutor's closing never referenced that testimony.

E.      Sentencing

Turner's last argument is that the government improperly based its opposition to a downward variance on Turner's exercise of his First Amendment rights and that by doing so it "poisoned" the sentencing proceedings.

He bases this argument on the government's sentencing memorandum, which encouraged the court to consider that Turner's public conduct after being accused of corruption "affirmatively

promoted disrespect for the law," "demeaned the seriousness of his offense," and "eroded the public's trust in law enforcement and the criminal justice system." The government quoted Turner's statements to the press and a speech to his constituents. The memorandum further characterized Turner's public comments as "an incendiary campaign of misinformation, obfuscation and blame" that had been "divisive in its intent and in its effect."

Additionally, at the sentencing hearing, the prosecutor said that Turner had been "railing for many months about how the Government's case was, quote, infected with racism." The prosecutor also said that Turner "exacerbated" his crime by, for example, "going out on the street and accusing the Government, falsely accusing the Government, of all sorts of improper motives."

The government recommended a sentence within the guidelines range which was enhanced to thirty-three to forty-one months when the court found that Turner perjured had himself. The government made no recommendation as to where within this range the court should sentence Turner. The court sentenced Turner to thirty-six months' imprisonment, near the middle of the guidelines range.

"While we may presume vindictiveness when the Government changes its legal position after the exercise of a constitutional right by the defendant, the harshness of this presumption requires that we do so only when 'a reasonable likelihood of vindictiveness

-46-

exists.'"  <u>United States</u> v. <u>Rolfsema</u>, 468 F.3d 75, 79 (1st Cir. 2006) (quoting <u>United States</u> v. <u>Goodwin</u>, 457 U.S. 368, 374 (1982)). A finding of vindictiveness would require reversal for resentencing.  <u>See</u> <u>United States</u> v. <u>Crocker</u>, 788 F.2d 802, 809 (1st Cir. 1986).

Turner's challenge to his sentence fails because the basis for his vindictiveness argument is incorrect.

The government brought up Turner's public statements only for the purpose of rebutting an argument the government expected Turner to make that he was entitled to a lower sentence because of the acceptance of responsibility sentencing guideline or a downward departure request on the same grounds.  <u>See</u> Government's Sentencing Memorandum at 2-4, <u>United States</u> v. <u>Turner</u>, No. 08-cr-10345 (D. Mass. Jan. 20, 2011), ECF No. 357.  The government's sentencing memorandum argued that Turner's out-of-court statements that his prosecution was racially motivated showed that he had not accepted responsibility, and the memorandum also referred to his perjury.

In addition, the district court explicitly stated that it had declined to consider Turner's public statements in coming to its sentencing decision, stating that it was not "likely to attach any significance one way or the other with respect to the question of Mr. Turner's assertions about the source of the prosecution . . . it is not weighing in the balance."  The court based its sentence on Turner's offense conduct and his perjurious testimony

and sentenced him within the guidelines.  In discussing the basis for its sentence, the court gave a long and thoughtful analysis of Turner's conduct and the sentencing factors and concluded that a guidelines sentence of three years was appropriate.

Turner has not shown prosecutorial vindictiveness in the government's sentencing recommendation.  And the court made an independent sentencing decision based on the guidelines.  Given the facts as found by the jury, the sentence was reasonable.

IV.

We _affirm_ Turner's convictions and his sentence.