# United States Court of Appeals
## For the First Circuit

Nos.  11-2130
      11-2163

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD W. MCDONOUGH and SALVATORE F. DIMASI,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Mark L. Wolf, U.S. District Judge]

Before

Howard, Circuit Judge,
Souter,* Associate Justice,
and Lipez, Circuit Judge.

   Martin G. Weinberg, with whom Kimberly Homan was on brief, for
appellant Richard W. McDonough.
   Thomas R. Kiley, with whom William J. Cintolo and Cosgrove,
Eisenberg & Kiley, P.C. were on brief, for appellant Salvatore F.
DiMasi.
   John-Alex Romano, Attorney, Appellate Section Criminal
Division, United States Department of Justice, with whom Carmen M.
Ortiz, United States Attorney, S. Theodore Merritt, Kristina E.
Barclay, Assistant United States Attorneys, Lanny A. Breuer,
Assistant Attorney General and John D. Buretta, Deputy Assistant
Attorney General, were on brief, for appellee.

---

   *Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

August 21, 2013

**HOWARD, <u>Circuit Judge</u>**.  After a six-week trial, a jury in the District of Massachusetts convicted Salvatore F. DiMasi, the former Speaker of the Massachusetts House of Representatives, and Richard W. McDonough, a lobbyist, of numerous crimes resulting from a scheme to funnel money to DiMasi in exchange for political favors.  A third alleged participant, DiMasi's friend and financial advisor Richard Vitale, was acquitted.  A fourth, Joseph Lally, pled guilty and cooperated with the government.  The basic contours of the scheme saw Lally, as an employee of one company and later as a principal in another, make payments to DiMasi, who in return took official actions in his role as House Speaker to benefit Lally's business concerns.  The money was funneled to DiMasi through McDonough, Vitale and Steven Topazio, an attorney who shared a law practice with DiMasi and who was not criminally charged.

The district court denied DiMasi's and McDonough's post-trial motions and subsequently sentenced them to ninety-six and eighty-four months' imprisonment, respectively.  On appeal, each of them advances a panoply of arguments that fall into four general categories:  1) sufficiency of the evidence; 2) jury instructions; 3) evidentiary issues; and 4) sentencing.  After considering the extensive arguments of able counsel, we affirm the convictions and sentences.

# I. FACTUAL BACKGROUND

To the extent that the appellants assert claims of insufficient evidence, we describe the facts in the light most favorable to the jury's verdict. United States v. Urcioli, 613 F.3d 11, 13 (1st Cir. 2010) ("Urcioli II"). We first outline the salient facts underlying the convictions, adding more details later as necessary.

A state representative since 1979, DiMasi was elected Speaker of the Massachusetts House of Representatives in September 2004. He was also a practicing attorney, but as his legislative and political responsibilities increased, his income from his law practice declined and his personal debt grew. Both McDonough and Vitale were long-standing friends of DiMasi.

Until February 2006, Lally was a Vice President of Cognos Corporation, an international software company. Lally was the head of Cognos's lobbying arm, the aim of which was to boost the sale of Cognos software to state and local governments. After leaving Cognos in 2006, Lally formed Montvale Solutions, a reseller of Cognos software, for which Montvale was paid a twenty percent commission. Lally and DiMasi were not strangers, as DiMasi had previously represented Lally in a criminal matter and also attended his wedding. Cognos was one of McDonough's lobbying clients. He assisted Lally in gaining access to the government officials who would make decisions about software purchases and funding.

-4-

In December 2004, McDonough told Lally that he was looking for a way to supplement DiMasi's income. He suggested that Lally have Cognos hire DiMasi's law partner Topazio and pay him a monthly retainer, a portion of which would be transferred to DiMasi under the auspices of the lawyers' existing fee-sharing arrangement. DiMasi subsequently told Topazio that McDonough would soon be referring a new client to him. Later in December, McDonough and Lally met with Topazio, whereupon they agreed that Cognos would retain Topazio for six months at a rate of $5000 per month. Although Topazio's legal practice was focused on real estate matters and criminal and personal injury cases, McDonough explained that Cognos would be hiring him for contract work related to Cognos software. Lally testified that he agreed to the "sham" contract in order to "funnel money" to DiMasi and that he was trying to "gain favor with the Speaker, to have him help us close software, cut deals, and obtain funding for us."

After the deal was struck, McDonough told Lally that it was important for Lally and Cognos to "find something for [] Topazio to do to sort of cover [their] ass if something ever[] blew up." As Lally had authority only to hire lobbyists, he told McDonough that he would hire Topazio for that function, rather than lawyering, in order to ensure that the hire would be approved by Cognos. Topazio received a six-month contract from Cognos in March 2005, but was surprised to see that it was a lobbying contract, not

one for legal services as had been discussed at their earlier meeting. When Topazio made further inquiries, Lally presented it to him as a "take it or leave it" proposition. Topazio also called DiMasi, who instructed him to sign the contract, rather than "screw up" the arrangement by attempting to negotiate terms with Lally. Topazio complied.

As provided by the contract, Topazio received the first $5000 payment from Cognos in early April 2005. Complying with DiMasi's demand, Topazio paid $4000 to DiMasi as a referral fee, a figure that was higher than their typical fee-sharing arrangement, although Topazio subsequently reverted to splitting the payment evenly with DiMasi. The contract was renewed three times, with Topazio receiving $125,000 from Cognos and transferring $65,000 to DiMasi. At one point in time, Cognos failed to make several of the $5000 payments to Topazio and "caught up" with one payment of $25,000, which DiMasi demanded from Topazio in its entirety. DiMasi returned Topazio's $25,000 check, however, and requested that he send four smaller checks, which Topazio did. At no point during the time that Topazio was under contract did Cognos, Lally, or McDonough ask him to perform any work.

In 2005, at roughly the same time as the Lally-McDonough-Topazio deal was being finalized, the Massachusetts Department of Education ("DOE") requested proposals for a pilot program known as Education Data Warehouse ("EDW"), that would employ software to

aggregate DOE data from multiple databases into a single format. The DOE's plan was to spread the EDW project statewide, eventually. Cognos wanted to procure both the pilot and statewide contracts, from which Lally would receive commissions on payments to Cognos.

Cognos submitted a $5 million bid, with $500,000 for the software relating to the pilot program and the remaining $4.5 million targeted at the statewide project if the pilot program proved successful. Cognos was awarded the pilot project in August 2005, but the statewide project would require legislative funding. Lally then impressed upon McDonough the importance of "get[ting] to the Speaker [to] get funding for this project that DOE wanted." Lally also "reminded" McDonough of the relationship with Topazio, telling him that "it was time for it to pay off." McDonough responded with a promise to contact DiMasi.

Prior to the award of the pilot contract, DiMasi and McDonough discussed with Lally the prospect of DiMasi speaking with DOE Commissioner David Driscoll on Cognos's behalf. Among the issues that Lally wanted DiMasi to raise with Driscoll was the claim that a Cognos competitor had provided a poor software product for the state trial court system. In October 2005, after the pilot project award, Driscoll spoke with DiMasi about legislation to fund the statewide project. DiMasi cautioned Driscoll not to choose "the company that screwed up the courts." When Driscoll told DiMasi that he thought that Cognos would be selected, DiMasi

-7-

expressed that he "was fine with that" and said, "if we can help, let us know." DiMasi also contacted House Majority Whip Linda Hawkins regarding the EDW project, instructing her to inform Driscoll that DiMasi would ensure that any data collection enterprise that DOE proposed would be included in the state budget.

In fact, Massachusetts Governor Romney did not include the funding in his proposed 2007 budget. Lally conferred with McDonough about speaking with DiMasi; McDonough told him that he would "take care of it." DiMasi subsequently had his legal counsel draft a budget amendment providing $5.2 million for the overall EDW project, $4.5 million of which was specifically earmarked for software. The draft amendment was shared with McDonough and Lally.

By this time, Lally had already left Cognos for Montvale. Before doing so, however, he negotiated a deal with Cognos that provided him a 20% commission on software deals that he had arranged, but had not yet closed. EDW was one such deal. Lally also advised his successor at Cognos, Christopher Quinter, never to cancel a contract "for a lobbyist named Topazio." He said that Topazio was a "friend to Sal" and would be helping Lally. Fearing that an inquisitive Quinter would uncover the details of the scheme involving McDonough, Topazio and DiMasi, Lally also told Quinter not to tell McDonough about the Topazio deal, even though,

obviously, McDonough was privy to it.  Lally explained that he wanted Quinter "to stay as far away from [the deal] as possible."

As the legislative process moved forward, State Representative Robert Coughlin sponsored the EDW amendment -- with the software earmark -- because he was "honored" to make a proposal that was of such importance to the Speaker.  DiMasi's staff also informed the House Ways and Means Committee of the Speaker's support for the EDW project, and the staff was kept in the informational loop regarding the legislative progress.  At some point while the legislation was pending, DOE asked that the earmark be removed from the legislation out of fear that the $4.5 million designated for software would not leave enough money for implementation and deployment.  Lally voiced objection to DiMasi because such a move would reduce his commission.  DiMasi ensured that the earmark remained in the legislation.

In May 2006, as the budget -- including the EDW amendment and software earmark -- neared enactment, McDonough told Lally that he would have to pay $100,000 each to McDonough and to DiMasi's friend and financial advisor Vitale after the deal closed. McDonough told Lally that the money paid to Vitale was to be shifted to DiMasi through a line of credit that Vitale would extend to him.  Lally received his commission when the budget was signed into law.  He testified that he paid the money because he was "told that's what I need to do in order to get the deal and the funding

through the Speaker." DiMasi thanked Lally when the latter informed him that he had given Vitale a check for $100,000. In June 2006, a company that Vitale controlled extended a $250,000 line of credit to DiMasi in exchange for a third mortgage on his home. DiMasi drew on the line of credit, repaying it only after the media began looking into his relationship with Cognos. Also in June, but before the budget was passed, Lally played golf with McDonough and DiMasi. At one point, the Speaker said to the other two men, "I am only going to be Speaker for so long, so it is important that we make as much hay as possible." After giving Lally a "high five," McDonough said, "How about that. You got the speaker telling you something like that."

As the EDW machinations were concluding, DiMasi, McDonough and Lally charted a course designed to legislate another Cognos contract, which would in turn generate a commission for Lally and payments to McDonough and DiMasi. The plan centered around obtaining a software licence for Cognos software known as Performance Management ("PM"), which was designed to improve the performance of state agencies through substantial data collection.

In Massachusetts, responsibility for statewide technology matters rests with the Information Technology Division ("ITD") of the Office of Administration and Finance. Lally began the process by telling the acting head of ITD, Bethann Pepoli, that DiMasi wanted to discuss PM. At Lally's urging, Pepoli met with DiMasi

-10-

and his chief of staff. Despite his own lack of computer sophistication, DiMasi, armed with talking points that Lally had provided, said that he wanted software on his computer to track state spending. Despite Pepoli's protests that existing software could accomplish the task, DiMasi instructed her to work with his staff to develop a bond bill for the project. Later in 2006, McDonough received draft legislation from Lally and his partner at Montvale, Bruce Major, that described the PM software in a way that helped ensure Cognos's selection for the project. The legislation also proposed $15 million in funding, $5 million more than ITD's estimate.

After Governor Patrick took office in early 2007, DiMasi urged him to include the $15 million in funding in the state's emergency bond bill, which was usually targeted at immediate needs. The Governor's office initially balked, since the Governor did not want the emergency bill laden with non-essential items and because a general bond bill would be proposed within a short time. The measure was eventually included in the emergency bill, which was passed into law in March 2007. State officials testified that the $15 million would not have remained in the emergency bond bill if the Speaker had not expressed his interest.

Even after the bond bill passed, Cognos faced competition from other vendors to win the contract award. Once again DiMasi got involved, meeting with various state officials and the

Governor, and recommending that Cognos be selected as the PM vendor. Phone records also showed calls between Lally, Vitale, DiMasi and McDonough on one particularly important day of meetings. Although Administration and Finance Secretary Leslie Kirwan's concerns over the cost of the contract led her to negotiate a $2 million reduction from the proposed $15 million, Cognos was awarded the contract. Kirwan expressed to a colleague her hopes that "the big guy down the hall" -- meaning DiMasi -- was happy. Despite his expressed interest in funding the project, neither DiMasi nor his staff ever followed up with state officials about the project or its implementation after the bill's passage.

Prior to the PM bill's passage, Vitale told Lally that he would have to be paid $500,000 to ensure the legislation's success. Upon receiving a $2.8 million commission from Cognos after the bill passed, Lally paid $500,000 to an entity controlled by Vitale from which DiMasi would draw funds, as well as $200,000 to McDonough, who then returned $50,000 to Lally, unbeknownst to Lally's partner.

After the PM contract was signed in August 2007, an unsuccessful bidder lodged a formal protest, claiming that the bid was the product of irregularities in the process. After a review, the contract was voided, and Cognos's successor in interest had to return the $13 million to the Commonwealth. No replacement project was sought or funded.

-12-

In March 2008, Boston Globe reporters began raising questions about the cancelled Cognos contract, eventually publishing a story on March 10. Before the story ran, each of the participants involved in securing the deal began covering his tracks. For example, DiMasi told his press secretary that he did not know Lally and was unaware of payments to Topazio or of the Topazio-Cognos contract. He also remarked to Topazio that certain check register entries reflecting payments to DiMasi should get "lost." McDonough was present when the Globe called Lally for comment before publishing the first story.[1] McDonough responded, "Oh, the shit's going to hit the fan now." After the story ran, McDonough and Lally frisked each other whenever they met to ensure that neither was "wearing a wire" to record the other. DiMasi also telephoned a meeting attended by McDonough, Lally and Vitale and admonished the trio, "If one of us breaks, we all fall." Two months after the first Globe story, DiMasi withdrew funds from his retirement account to pay off roughly $179,000 drawn on his line of credit.

In October 2009, a grand jury returned a superseding indictment charging DiMasi, McDonough, Vitale and Lally with conspiring to commit honest-services mail fraud, honest-services wire fraud, and extortion, in violation of 18 U.S.C. § 371 (Count

---

[1] The Globe subsequently published stories addressing DiMasi's line of credit with Vitale's company and the Cognos-Topazio contract.

1); three counts of honest-services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346 (Counts 2-4); and four counts of honest-services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Counts 5-8).  DiMasi was also charged with extortion under color of official right, in violation of 18 U.S.C. § 1951 (Count 9), and Lally was charged with money laundering, in violation of 18 U.S.C. § 1957.  As noted, Lally entered into a plea agreement and Vitale was found not guilty.  The jury convicted DiMasi and McDonough on the counts that applied to them.

## II.  LEGAL ISSUES

A. Sufficiency of the Evidence

Both DiMasi and McDonough claim that the evidence was legally insufficient to support their convictions.  We review their claims de novo, considering the evidence in the light most favorable to the verdict.  United States v. Rios-Ortiz, 708 F.3d 310, 315 (1st Cir. 2013).  "[R]eversal is warranted only where no rational factfinder could have concluded that the evidence presented at trial, together with all reasonable inferences, established each element of the crime beyond a reasonable doubt." Id. (quoting United States v. Symonevich, 688 F.3d 12, 23 (1st Cir. 2012)).  We need not conclude "that no verdict other than a guilty verdict could sensibly be reached," but must only be satisfied that the verdict finds support in a "plausible rendition of the record." United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006).

-14-

We first address the substantive counts leveled against both appellants.

### 1. Honest Services Fraud

Federal law proscribes using the mail or wires in connection with a "scheme or artifice" to defraud. See 18 U.S.C. §§ 1341, 1343. As relevant here, a "'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. In construing this definition, however, the Supreme Court in Skilling v. United States held that section 1346 reaches only those schemes that involve bribes or kickbacks, 130 S. Ct. 2896, 2931-34 (2010), and "draws content" from, inter alia, federal statutes proscribing bribery of public officials and witnesses, see 18 U.S.C. § 201, and kickbacks, see 41 U.S.C. § 8701.

In the context of public officials, a bribe is the receipt of "anything of value . . . in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201. In addition, because "[t]he illegal conduct is taking or agreeing to take money for a promise to act in a certain way," United States v. Brewster, 408 U.S. 501, 526 (1972), the government must prove that an agreement for a quid pro quo existed; that is, the receipt of something of value "in exchange for" an official act. United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 404-05 (1999). Such an agreement need not be tied to a specific

-15-

act by the recipient.  See United States v. Terry, 707 F.3d 607, 612 (6th Cir. 2013); United States v. Ganim, 510 F.3d 134, 148 (2d Cir. 2007).  "It is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose."  Terry, 707 F.3d at 612 (quoting United States v. Abbey, 560 F.3d 513, 518 (6th Cir. 2009).  Ultimately, "[w]hat is needed is an agreement . . . which can be formal or informal, written or oral.  As most bribery agreements will be oral and informal, the question is one of inferences taken from what the participants say, mean and do, all matters that juries are fully equipped to assess."  Id. at 613; see also Evans v. United States, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring in part and concurring in the judgment) ("[T]he trier of fact is quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor.").  As there is no dispute that the transactions at issue used both mail and wire, we focus on the appellants' contentions regarding the alleged scheme to defraud.

We start by noting that "evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions."  United States v. Friedman, 854 F.2d 535, 554 (2d Cir. 1988).  Accordingly, "the best evidence of [DiMasi's] intent to perform official acts to favor [Lally's] and

-16-

[Cognos's] interests is the evidence of [DiMasi's] actions on bills that were important to [Lally]."  United States v. Woodward, 149 F.3d 46, 60 (1st Cir. 1998) (internal quotation marks omitted).  We conclude that a rational jury could easily find beyond a reasonable doubt that DiMasi and McDonough took part in a scheme that saw DiMasi exchange his official acts for money.  These actions fit comfortably into what the Supreme Court has described as a "classic kickback scheme," in which a public official uses a middleman to help another entity -- here Lally and Cognos -- generate revenue or commissions and the proceeds are shared with the official and the middleman.  See Skilling, 130 S. Ct. at 2932 (citing McNally v. United States, 483 U.S. 350, 352-53 (1987)).

Here, the jury was instructed to consider only the payments to Topazio and Vitale -- but not the payments to McDonough -- for purposes of the honest services fraud charges.  A reasonable jury could have concluded that the contract with Topazio constituted a stream of payments intended for DiMasi in exchange for DiMasi providing benefits to Cognos and Lally.  See Ganim, 510 F.3d at 148.  Moreover, the payments that McDonough steered from Lally to Vitale also supported the existence of a scheme, and were especially close in time to the actions that DiMasi took on behalf of Lally with respect to the PM project.  Finally, the jury could have drawn inferences of guilt from the defendants' behavior before and after their arrangements came under scrutiny, including

-17-

DiMasi's instructions to Topazio to deliver smaller checks and his "suggestion" that a checkbook register should become "lost," as well as Lally and McDonough's habit of frisking each other for recording devices and DiMasi's admonition that one of them "breaking" would result in a "fall" for all of them.

The appellants generally attack Lally's credibility, referring to him -- with record support -- as a "self-admitted liar who was proven to have a reputation within Cognos as a liar." They also highlight the many benefits that he received as a result of his plea agreement, including a relatively short prison sentence and avoidance of the forfeiture of his home. The attempt to base their sufficiency argument on Lally's unsavoriness, however, necessarily fails. To be sure, as a witness testifying pursuant to a plea agreement, Lally had incentive to lie. But whatever his evidentiary warts may have been, Lally's credibility was for the jury to weigh. United States v. Appolon, 695 F.3d 44, 55 (1st Cir. 2012); see United States v. Rosario-Diaz, 202 F.3d 54, 67 (1st Cir. 2000) (noting that uncorroborated testimony of a cooperating witness is sufficient to sustain a conviction unless the testimony is "facially incredible"). Moreover, Lally was subject to extensive cross-examination, and the jury was instructed to regard his testimony with caution.

The appellants next argue that the payments to Topazio cannot support their convictions. They first seize upon one

-18-

sentence in Lally's testimony, in which he said that he made the payments to Topazio "hoping . . . to reap some benefits."  Such a blind "hope," according to the appellants, cannot form the basis of the required quid pro quo arrangement.  This argument, however, does little more than isolate a single sentence out of Lally's testimony -- and a single word within that sentence -- devoid of the context of his testimony writ large that <u>does</u> suggest such an arrangement.  <u>See, e.g.</u>, <u>United States</u> v. <u>Turner</u>, 684 F.3d 244, 258 (1st Cir.) (holding that in light of other evidence, payor's use of the term "gratitude" did not prevent the jury from finding that payment was a bribe, rather than a legal gratuity), <u>cert. denied</u>, 133 S. Ct. 629 (2012).  For example, the jury could have found that DiMasi's comment about "making as much hay as possible" was an expression of his intent to keep the money flowing.  Moreover, Lally's testimony that he was told that he had to pay the money to get the deals done also supports the jury's verdicts.

And there was more.  There can be little doubt that the Topazio contract was a sham.  It first called for the performance of services that Topazio ordinarily did not render and then ultimately paid him for doing no work.  McDonough set up the contract and Topazio also made DiMasi -- who knew where Topazio's legal expertise lay -- aware of it.  Additionally, DiMasi at first took a higher-than-normal referral fee and later told Topazio to structure the lump-sum payment into smaller amounts, an act which

-19-

the jury could have viewed as an attempt to conceal his misdeeds. See Urcioli II, 613 F.3d at 14 n.2 (noting that defendant's effort to hide a business relationship could be evidence to support honest-services fraud conviction).

The appellants also argue that the timing of DiMasi's official acts in support of Cognos, as compared to the timing of payments to DiMasi, should have precluded the jury from finding a connection between the payments and the acts. They also point to the period of time during which no payments were made to Topazio and the period between the lapse of one contract and the signing of the next as fatal evidentiary defects. We disagree. "[B]ribery can be accomplished through an ongoing course of conduct, so long as the evidence shows that the 'favors and gifts flowing to a public official [are] in exchange for a pattern of official actions favorable to the donor.'" Ganim, 510 F.3d at 149 (quoting United States v. Jennings, 160 F.3d 1006, 1014 (4th Cir. 1998)). Here, the evidence shows a chain of events that began with the 2004 discussion between McDonough and Lally and continued with Cognos's first payment to Topazio in April 2005 and Topazio's first "referral" payment to DiMasi shortly thereafter. Lally and McDonough subsequently spoke with DiMasi about contacting DOE Commissioner Driscoll before the pilot project was awarded to Cognos. DiMasi spoke with Driscoll, and had Representative Hawkins to do the same, about obtaining legislative funding for EDW after

-20-

the pilot project was awarded.  Against this backdrop, we have little trouble concluding that a reasonable jury could have found that the Topazio payments supported the guilty verdicts.

We reach the same conclusion concerning the payments to Vitale.[2]  The appellants argue that the evidence could not support a finding that the payments to Vitale supported the convictions, as there was a lack of any nexus between the payments and any benefit to DiMasi.  McDonough also specifically argues that there was no evidence that he was aware of the putative benefit to DiMasi.  As to the latter, Lally testified that McDonough said that the $100,000 payment on the EDW deal would inure to DiMasi through the line of credit.[3]  As to the former, the evidence established that

_____

[2]     The payments to either Vitale or Topazio would be sufficient to support the verdicts.  We address both for the sake of completeness.  And to the extent that appellants seek succor from Vitale's acquittal, there is none to be had.  See United States v. Rogers, 121 F.3d 12, 16 (1st Cir. 1997) ("A not guilty verdict against one co-conspirator is not the equivalent of a finding that the evidence was insufficient to sustain the conspiracy conviction of a second co-conspirator." (citing United States v. Bucuvalas, 909 F.2d 593, 595-97 (1st Cir. 1990))).  If the evidence is "sufficient to support the verdict against the convicted defendant, the conviction must stand despite the co-conspirator's acquittal."  Id.

[3]  McDonough argues that Lally's testimony was uncorroborated. We disagree.  The evidence showed that Vitale directed one of his companies -- Washington North -- to extend a $250,000 line of credit to DiMasi and his wife; that Montvale paid $100,000 to an entity controlled by Washington North, and that entity -- WN Advisors -- was created the same day as the line of credit was ordered; and that Montvale and WN Advisors entered into what could have been seen as a sham consulting agreement to legitimize the $100,000 payment.

-21-

Vitale still had control over the $500,000 received from Cognos's successor Montvale, and that DiMasi planned to join Vitale's lobbying firm where, the jury could have found, DiMasi would have access to the money: Lally testified that Vitale said that he wouldn't be getting any of the money, but that "it all goes to Sal." The record evidence sufficiently ties the Vitale payments to DiMasi and supports McDonough's guilt on the honest services charge.

2. Extortion

The jury convicted DiMasi of extortion under color of official right, in violation of 18 U.S.C. § 1951. To secure a conviction, the government must prove "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Turner, 684 F.3d at 253 (citing Evans, 504 U.S. at 268). "[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the quid pro quo is not an element of the offense." Id. (quoting Evans, 504 U.S. at 268). Finally, as we observed in Turner, some courts have held that a quid pro quo or reciprocity is necessary to support the conviction, "but that the agreement may be implied from the official's words and actions." Id. at 253-54 (quoting Ganim, 510 F.3d at 143); see also Evans, 504 U.S. at 274 (Kennedy, J., concurring) (observing that official and payor "need not state the

-22-

quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods").[4]

Here, for the same reasons that we found the evidence sufficient to support the honest-services fraud convictions, we hold that the jury was presented with enough evidence to support DiMasi's extortion conviction. There is no need to repetitively recite that evidence.

### 3. Conspiracy

In addition to the substantive honest-services fraud counts, McDonough and DiMasi were convicted of conspiracy to commit honest-services fraud. A conspiracy conviction under 18 U.S.C. § 371 requires proof that the defendant agreed to commit an unlawful act and voluntarily participated in the conspiracy, and that an overt act was committed in furtherance of the conspiracy. United States v. Gonzalez, 570 F.3d 16, 24 (1st Cir. 2009). Where, as here, the indictment alleges a conspiracy to commit multiple offenses, the conviction may be upheld as long as the evidence supports a conspiracy to commit any one of the offenses. United States v. Muñoz-Franco, 487 F.3d 25, 46 (1st Cir. 2007). Further,

---

[4] With respect to both the honest-services and extortion counts, the appellants urge us to follow McCormick v. United States and require proof that "the payments [were] made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." 500 U.S. 257, 273 (1991) (emphasis added). We decline to do so, however, as we have held that McCormick applies only in the context of campaign contributions. See United States v. Turner, 684 F.3d 244, 253-54 (1st Cir.), cert. denied, 133 S. Ct. 629 (2012).

an agreement to join a conspiracy "may be express or tacit . . . and may be proved by direct or circumstantial evidence." United States v. Rivera Calderón, 578 F.3d 78, 88 (1st Cir. 2009). Such evidence may include the defendants' acts that furthered the conspiracy's purposes. United States v. Rodriguez-Reyes, 714 F.3d 1, 7 (1st Cir. 2013).

We have little trouble concluding that the evidence was sufficient to support the jury's finding of the required agreement and participation. The jury was instructed on the conspiracy count that it must find that a defendant, inter alia, agreed to commit a crime involving payments to DiMasi or payments to another person that were caused by DiMasi. The appellants argue that the evidence failed to prove that Dimasi "caused" Lally or Cognos to make the payments to Vitale or McDonough.[5] This argument, however, rests on a cramped reading of "cause", viz., that term must be considered literally, i.e., that DiMasi "made it happen." We decline such a narrow construction. One can "cause" something to happen by "bring[ing] it about," or by "produc[ing] an effect or result." Black's Law Dictionary 251 (9th ed. 2009). Under any definition, however, the evidence that we have already outlined was sufficient

---

[5] On the substantive counts the instruction required a finding that the scheme involved a thing of value given to DiMasi or caused by DiMasi to be given to Vitale. The extortion instruction required that DiMasi caused the payments to Vitale or McDonough.

to support a finding that DiMasi caused the payments by agreeing to perform official acts in exchange for the payments.

In the end, the appellants' sufficiency arguments fail with respect to their convictions for honest-services mail and wire fraud, conspiracy to commit honest-services fraud, and DiMasi's extortion conviction.

B. Jury Instructions

DiMasi and McDonough also assert a host of instructional errors. We review the preserved errors under a "bifurcated framework." DeCaro v. Hasbro, Inc., 580 F.3d 55, 61 (1st Cir. 2009). We review de novo whether the instructions "conveyed the essence of the applicable law and review for abuse of discretion questions about whether the court's choice of language was unfairly prejudicial." United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012). Withal, an incorrect instruction does not require reversal if the error was harmless. Id. In the case of an error of "constitutional dimension," the government is required to establish beyond a reasonable doubt that the error did not influence the verdict. Id. Other errors will not warrant reversal "as long as it can be said 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" Id. (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)). Regardless of the nature of the error, we analyze the challenged

instruction "in light of the evidence, and determine whether, taken as a whole, the court's instructions fairly and adequately submitted the issues in the case to the jury." United States v. Tom, 330 F.3d 83, 91 (1st Cir. 2003) (internal quotations and citations omitted).

Here, the appellants challenge the trial court's refusal to give particular instructions, which, as noted, is reviewed for abuse of discretion. We will reverse only if the requested instruction was: 1) substantively correct; 2) not substantially covered in the charge as delivered; and 3) integral to an important point such that the failure to give the instruction seriously undermined the defendant's ability to present a particular defense. See United States v. De La Cruz, 514 F.3d 121, 139 (1st Cir. 2008). When an instruction is refused, reversal is not warranted unless the defendant suffers substantial prejudice. Id. We address the appellants' ten instructional plaints in turn.

### 1. Distinguishing Between Bribes and Gratuities

McDonough argues that the trial court's instructions did not sufficiently differentiate between illegal bribes and legal gratuities. See Ganim, 510 F.3d at 146 (describing a legal gratuity as something "given to curry favor because of an official's position"). As relevant here, the district court instructed the jury that the government must do more than prove that "Cognos and/or Lally made a payment to DiMasi or Vitale only

-26-

to cultivate a business or political relationship with DiMasi or only to express gratitude for something DiMasi had done." McDonough does not contend that this instruction was incorrect. Instead, he argues that the jury should have been given clearer guidance as to what constituted legal behavior. He requested the jury be instructed that:

> providing money to a public official merely as a reward for some future act that the public official will take (or may have already determined to take), or to build a reservoir of good will, or to curry favor, hoping it would affect future performance, or for a past act that he has already taken, does not constitute honest services fraud.

This requested instruction was "substantially covered in the charge actually given." De La Cruz, 514 F.3d at 139. In our view, the charge's exclusion from illegal conduct efforts to "cultivate a business relationship" or "express gratitude" sufficiently encompasses McDonough's specific references so as to pass muster. The district court was not required to provide an exhaustive list of conduct that would not be illegal. There was no abuse of discretion.[6]

---

[6] McDonough places great weight on the changes Skilling brought to bear on honest-services cases. Essentially, McDonough argues that the jury should have been instructed on the actions that, post-Skilling, no longer fit within the ambit of an honest-services conviction. We disagree. Contrary to McDonough's argument, the jury was instructed on the nature of a gratuity consistent with his defense, and McDonough argued the point to the jury. No more was required.

## 2.  Theory of Defense

McDonough next argues that the district court failed to adequately instruct the jury on his main theory of defense -- that he was at all relevant times acting as a lobbyist engaged in legal behavior central to his job.  As to this argument, the district court first instructed the jury that "any payment to Vitale only to lobby public officials, meaning to advocate positions to public officials or to provide strategic advice to clients seeking public contracts or for business advice is not a basis for a mail or wire charge."  The court also charged the jury that, "[i]t is also not unlawful for a person to receive a payment he genuinely believes was made only to compensate him for lobbying public officials or for providing strategic advice to clients seeking public contracts or for providing business advice."[7]

As with the previous instruction, McDonough does not claim that the court's instruction was legally incorrect.  Instead, he asserts that a more complete instruction describing more aspects of lobbying, including its protection by the First Amendment, was required in order for him to assert his defense.  We disagree. Read as a whole, the instructions adequately conveyed to the jury

---

[7]  Since the district court did not allow the jury to consider the payments to McDonough as part of the honest-services fraud counts, those payments were not included in the first instruction quoted above.  Nevertheless, McDonough could have been found guilty if the jury believed that he participated in a scheme to provide money either to Topazio or Vitale for DiMasi's benefit.

-28-

the lawfulness of the activities that McDonough stressed to the jury through witnesses and arguments, specifically his having referred Lally to Vitale and his role in the relationship between Lally and Topazio.  Nothing in the instructions prevented the jury from concluding that McDonough's conduct with respect to the payments made to Topazio or Vitale fell within the confines of lawful lobbying.  By the same token, however, the jury was also free to reject the defense.

### 3.  The "Sole Purpose" Instruction

Both McDonough and DiMasi take aim at the court's instructing the jury, after giving some examples, that "[i]n essence, any payment made or received by a defendant solely for one or more lawful purposes is not a basis for a mail or wire fraud charge."  They argue that because this instruction did not mention the government's burden of proof, the burden was effectively placed on them to prove that the sole purpose of the payments was a lawful one.  The very next words spoken by the trial judge are fatal to this argument:  "However . . . people at times act with a mixture of motives.  If the government proves beyond a reasonable doubt a payment made in exchange for an official act, it is not required to prove that this was the only reason for the payment."  The government's burden was also repeated numerous times throughout the charge.  There was no error.

McDonough also argues that the definition of honest-services fraud neither sufficiently described what was <u>not</u> illegal nor specifically named McDonough such that a jury would be able to apply his defensive arguments.  We rejected these arguments in connection with other instructions and do so again here.

### 4.  Silent Understanding

McDonough's next argument relates to the conspiracy count.  The court instructed the jury, in relevant part, that "the evidence to establish the existence of a conspiracy need not show that the conspirators entered into an express agreement . . . . It is sufficient if an agreement is shown by conduct evidencing a silent understanding to share a purpose to violate the law." McDonough argues that the term "silent understanding" invited the jury to find an agreement where none existed.[8]  We disagree.  The court provided the instruction in recognition of the defense's argument that Lally's testimony was entirely unreliable and the government's fallback position that a conspiracy could be proved by circumstantial evidence.

McDonough's argument that the jury would use the instruction improperly to tie DiMasi's actions to a non-existent

---

[8]  We reject McDonough's argument that the phrase has been "resurrected . . . from obscurity."  It is well-settled that an agreement can be based on a tacit understanding. <u>See,e.g.</u>, <u>United States</u> v. <u>Maryea</u>, 704 F.3d 55, 76 (1st Cir. 2013) (observing that a tacit understanding between conspirators can support a conviction).  We see no meaningful difference between a "tacit" agreement and a "silent" one.

agreement falls short because, as previously noted, the court thoroughly instructed the jury both on the nature of lawful payments and, with great specificity, on the requirement that the evidence prove "that the members [of the conspiracy] in some manner came to a mutual understanding to try to accomplish their unlawful purpose" and that it was "not sufficient for the government to prove that a person merely acted in a way that happened to further some purpose of the conspiracy."  Finally, any loose ends were tied up with the instruction that a conspiracy conviction could not be based on "mere[] associat[ion] with someone committing a crime[,] . . . [or] mere[] kn[owledge] of illegal activity by other people." Viewed in the context of the whole, there was no error in the "silent understanding" instruction.

### 5.  Intent to Alter

McDonough next argues that the district court erroneously refused to instruct the jury that, in order to find quid pro quo bribery, it must find that a payment was made "with the specific intent of causing Mr. DiMasi to alter his official acts, to change his official position that he otherwise would not have taken or to take official actions that he would not have taken but for the payment."[9]  The district court's actual instruction was that

---

[9]  This language essentially quotes the instruction that was given in Urcioli II.  613 F.3d at 118.  There, however, we did not hold that such an instruction was required, and reiterated that the government must establish that payments were made "with the specific purpose of influencing [the official's] actions on

-31-

the government must prove beyond a reasonable doubt a scheme to exchange one or more payments for one or more official acts by DiMasi on behalf of Lally or Cognos. . . . [T]he government does not have to establish that DiMasi would not have taken official action as Speaker to promote the acquisition of an Educational Data Warehouse, business intelligence software or performance management software, including Cognos software, without [the charged] payments.

McDonough argues that the instruction conflicts with our precedent, as set forth in United States v. Sawyer, 85 F.3d 713 (1st Cir. 1996).  There, after noting that the jury must be adequately informed that "cultivation of business or political friendship" is not bribery, we observed that

[o]nly if instead or in addition, there is an intent to cause the recipient to alter her official acts may the jury find a theft of honest services or the bribery predicate of the Travel Act.  Absent some explicit explanation of this kind, the conventional charge will be slanted in favor of conviction.

Id. at 741.  Nowhere in Sawyer, however, did we equate "alter" with "doing something the official would not have otherwise done."  See also City of Columbia v. Omni Outdoor Adver., 499 U.S. 365, 378 (1991) (observing, in dicta, that "[a] mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid"). Indeed, elsewhere in Sawyer we noted that the jury had to find an "intent

official matters."  Id.

-32-

to otherwise influence or improperly affect the official's performance of duties," id. at 729, which tracks the instructions given in this case, in which the court defined "intent to defraud" as "to act with an intent to deprive the public of DiMasi's honest services by exchanging a payment for an official act.  In other words, the defendant must have intended that a payment would be made to influence an official act and would be received with the intent to influenced . . . ."[10]  We find no error in the court's refusal to give the requested instruction.

### 6.  Series of Payments

With respect to the honest-services fraud charges, the jury was instructed as follows:

> [I]t is not necessary for the government to prove that the scheme involved making a

---

[10]  McDonough directs us to the Third Circuit's decision in United States v. Wright, 665 F.3d 560 (3d Cir. 2012), in which the court ruled that an honest services bribery conviction required the jury to conclude, inter alia, that "the payor provided a benefit to a public official intending that he will thereby take favorable official acts that he would not otherwise take." Id. at 568.  As support for that proposition, Wright, in turn, cited United States v. Bryant, 655 F.3d 232, 240-41 (3d Cir. 2011).  But in Bryant, the court explicitly rejected the appellants' argument that a jury instruction was erroneous because it failed to require a finding that the payor intended to "'alter' the conduct of the public official . . . " Id. at 244.  Instead, the court held that instructions which "made clear that an intent to influence was required for a finding of guilt" were sufficient. Id. at 245.  As especially relevant here, the court noted that "there is no meaningful difference between an intent to 'alter,' and an intent to 'influence,' official acts." Id. at 245 n.14.  Here, as in Bryant, the instructions adequately conveyed that an intent to influence/alter was required, and thus the district court did not err in refusing to give the requested instruction.

-33-

> specific payment for a specific official act.
> Rather it would be sufficient if the
> government proves beyond a reasonable doubt a
> scheme to make a series of payments in
> exchange for DiMasi performing official
> actions benefitting Lally and Cognos as
> opportunities arose or when DiMasi was called
> upon to do so.

McDonough argues that this instruction "diluted" the distinction between bribes and gratuities. This argument is a branch from the same tree as the earlier claim that the evidence of the Topazio payments was insufficient to support the conviction. As we have already held that the evidence was sufficient to support the convictions and that the instructions as a whole adequately differentiated between bribes and gratuities, we need go no further with this particular argument.

### 7. Merits of Cognos's Products

At trial, the defendants requested that the court instruct the jury that "[t]he quality of the Cognos product" and the "merits of the idea of Performance Management" were a "circumstance to be considered in the case." While the court permitted the defense to argue that DiMasi "had a legitimate motive for anything and everything he did that resulted in Cognos getting the contract," it refused to explicitly instruct the jury as the defense requested. McDonough, without citing any supporting authority, argues that the jury was thus deprived of guidance on taking into account information that could have led them to

conclude that the defendants were acting in good faith rather than with criminal intent.  We do not find an abuse of discretion.

As the district court correctly instructed, the charges related to a "scheme to deprive the citizens of Massachusetts of DiMasi's honest services, rather than a scheme to deprive the Commonwealth of Massachusetts of money."  The issue in this case is not whether the defendants truly thought the software was a benefit to the Commonwealth; instead it is whether they intended to exchange payments to DiMasi for assistance to Cognos.  See United States v. Shields, 999 F.2d 1090, 1096 (7th Cir. 1993) (observing, in a judicial bribery case, that issuing a legally correct judgment is not a defense to a bribery charge and that because a party with a good case still "buys certainty," a legally correct decision conveys no useful information about the likelihood of a bribe).

The district court correctly instructed the jury on the charged offenses.  And the appellants were not precluded from arguing to the jury that the merits of the Cognos products was a mark in their favor.  But they were not "entitled to an instruction 'on every particular that conceivably might be of interest to the jury.'"  United States v. Duval, 496 F.3d 64, 78 (1st Cir. 2007) (quoting United States v. Rosario-Peralta, 199 F.3d 552, 567 (1st Cir. 1999)).

## 8. Benefit to DiMasi

DiMasi claims that the district court committed prejudicial error when it refused to instruct the jury, with respect to the extortion charge, that the payments to Vitale or McDonough must have been a "benefit" to him.[11] The district court relied on United States v. Green, 350 U.S. 415 (1956), in which the Court stated that extortion "in no way depends on having a direct benefit conferred on the person who obtains the property." Id. at 420. DiMasi argues that Green leaves open the requirement for at least an indirect benefit. The Third and Fifth Circuits have rejected this argument. See United States v. Jacobs, 451 F.2d 530, 535 (5th Cir. 1971) ("Under § 1951 . . . it is not necessary to show that a person charged with extortion or attempted extortion actually received any benefit."); United States v. Provenzano, 334 F.2d 678, 685-86 (3d Cir. 1964) ("We hold that it is not necessary to prove that the extortioner himself, directly or indirectly, received the fruits of his extortion or any benefits therefrom."). On the other hand, the Eighth Circuit has indicated that at least indirect payments may be required. See United States v. Evans, 30 F.3d 1015, 1019 (8th Cir. 1994) ("The Hobbs Act requires proof,

---

[11] By contrast, the district court ruled that a benefit to DiMasi was required to prove the honest services fraud counts, and because evidence of benefit to DiMasi was lacking with respect to the payments to McDonough -- as opposed to those made to Topazio and Vitale -- the payments to McDonough were only considered for the extortion count.

among other elements, that the defendant received a benefit in exchange for the performance or nonperformance of an official act.").

We need not resolve this issue, however, as any error is ultimately harmless.  See Neder v. United States, 527 U.S. 1, 9 (1999) (noting that an instruction that omits an element of the offense "does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." (emphasis in original)).  "Harmless error review requires ascertaining 'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"  United States v. Newell, 658 F.3d 1, 17, n.19 (1st Cir. 2011) (quoting Neder, 527 U.S. at 15).  Here, assuming that a benefit to DiMasi was a required element, the evidence was "more than sufficient to support the convictions."  Id.  First, the payments through Topazio -- which are not claimed to be subject to the referred "benefit" instruction -- indisputably benefitted DiMasi.  Second, given that the jury had to find that payments were "given to Vitale for DiMasi's benefit" to sustain the convictions on the honest services fraud counts, we are confident that the same result would have obtained if they were so instructed on the extortion charge.

### 9. McCormick Instruction

DiMasi resurrects the argument that <u>McCormick</u> requires an explicit agreement between him and Lally, and that the jury should therefore have been so instructed. Having already rejected the argument that an explicit agreement is required, we must also conclude that the jury instruction claim necessarily fails.

### 10. State Law

DiMasi next argues that the district court should have instructed the jury on Massachusetts law concerning conflict of interest and attorney-client confidentiality. This issue came to the fore as a result of testimony from Governor Patrick and Secretary Kirwan that they would have handled the PM contract differently had they known of the payments to DiMasi and Vitale. DiMasi maintains that state law permits him to represent clients -- like Cognos -- on matters where the state is a party. He also suggests that he is not required by state law to disclose his private law practice clients. Thus, he argues that a "full explication of Massachusetts law was required to allow the jury to distinguish between bribery and other permissible and impermissible acts, to understand Dimasi's disclosure requirements and to differentiate DiMasi's official acts from his private acts."

Specifically, DiMasi requested an instruction noting that Massachusetts law allows legislators to "represent clients in their dealings with the state pursuant to a provision of the state's

conflict of interest law." See Mass. Gen. Laws. ch. 268A, § 4. We conclude, however, that the outcome here is controlled by Urcioli II, in which the appellant claimed that the jury should have been instructed on Rhode Island law that allows, inter alia, a state legislator to engage in private employment without creating a conflict of interest. Urcioli II, 613 F.3d at 15. The appellant there further argued that state law might outline the contours of a state legislator's duties such that the jury could better analyze whether the legislator had failed to perform them. Id. We concluded that the instruction was unnecessary because the appellant was charged with quid pro quo bribery, not for failing to disclose a conflict, and that "[n]othing in Rhode Island law purports to authorize or protect such conduct." Id. (quoting United States v. Urcioli, 513 F.3d 290, 298-99 (1st Cir. 2008) ("Urcioli I")). Moreover, we observed that such an instruction could have "misled the jury into thinking [the state law] could excuse bribery." Id. at 16.

The same result obtains here. As we have already determined, the jury was properly instructed on the bribery and extortion charges. The concern that the jury could have been misled into concluding that state law insulated DiMasi's conduct is just as apparent here as it was in Urcioli II. In addition, the jury was instructed that payments to DiMasi for providing legal services or referrals could not form the basis for a conviction.

To the extent that failure to disclose a conflict of interest was an issue, it arose only in the context of the government's burden of proving that the putative scheme to defraud involved a material falsehood, which includes non-disclosures. See Neder, 527 U.S. at 25. While DiMasi argues that the court's instruction could have resulted in the jury convicting him for an undisclosed conflict -- a result which could run afoul of Skilling -- the record shows that the jury was instructed to consider the undisclosed conflict only for purposes of materiality and, most importantly, after it had found that DiMasi had participated in a scheme involving payments exchanged for official acts. There being no indication that Massachusetts law would allow DiMasi not to disclose bribes ("payments made for official acts"), there was no error in refusing to instruct the jury on the Massachusetts law as DiMasi requested.

C. Evidentiary Issues

We review the district court's admission of evidence for abuse of discretion.[12] United States v. Tavares, 705 F.3d 4, 15 (1st Cir.), cert. denied, 133 S. Ct. 2371 (2013). Two evidentiary claims are presented.

---

[12] The parties clash over whether certain of DiMasi's evidentiary claims are unpreserved and should therefore be reviewed only for plain error. Because the arguments fail under even the less deferential abuse of discretion standard, we decline to resolve the dispute.

## 1. Testimony by Patrick and Kirwan

As previously noted, both Secretary Kirwan and Governor Patrick testified that the Patrick administration would not have executed the PM contract if they had known that DiMasi was receiving referral fees that originated from Cognos in exchange for his work in steering the contract to Cognos or if they knew that Vitale was receiving a $500,000 payment from the deal. The Governor also testified that he would have obtained advice from the state Ethics Commission regarding the $500,000 payment. Each official's testimony was admitted over defense objections.

DiMasi argues that the testimony should not have been admitted because he had no obligation to disclose the relationship among himself, Cognos, and Topazio. He further contends that the reference to the Ethics Commission created a risk that he would be convicted for an ethics violation such as an improper conflict of interest. We disagree. There is no dispute that materiality is an element of honest services fraud, and the reactions of two state officials integral to the contract process were relevant to that issue. And at the risk of repetition, we again note that the jury was charged with assessing whether DiMasi had been involved in a quid pro quo bribery scheme, not whether he had failed to disclose a conflict of interest. There was no reversible error in the admission of the testimony. To the extent that DiMasi argues that the court improperly balanced the testimony's probative value

against any unfair prejudice, it suffices to observe that "Only rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Pires, 642 F.3d 1, 12 (1st Cir. 2011). This is not one of those rare occasions.

### 2. Post-Conspiracy Statements

DiMasi argues that his post-conspiracy statements to Topazio, his Communications Director David Guarino and his Chief of Staff Maryann Calia after the March 2008 press inquiries began should not have been admitted as either proof of the conspiracy or to show consciousness of guilt. Topazio testified that after media accounts were published about the Cognos contract, DiMasi said to him that it "would have been nice if [Topazio] had lost" the portion of his check register that showed the $25,000 payment to DiMasi and also that Topazio should insert case names into the register to, in effect, legitimize the transactions after the fact. Guarino testified that during discussions in the aftermath of the newspaper articles, DiMasi did not reveal his involvement with state officials in the PM procurement, denied speaking with Pepoli, denied knowledge of Lally's involvement with Cognos, and said that he was unaware of a relationship or payments between Topazio and Cognos. During cross-examination by the government, Calia

-42-

confirmed her grand jury testimony that DiMasi had denied knowledge of the Cognos matter or Topazio's connection to it. The court's general instructions included the following:

> With regard to the allegedly false statements, you should first decide whether the statement was made and whether it was false. Similarly, you should decide whether a defendant did something to conceal information. If so, you should decide whether any false statement or action to conceal is evidence of consciousness of guilt concerning any or all of the crimes charged in this case. You should consider that there may be reasons for a person's actions that are fully consistent with innocence of the crimes charged in this case. In addition, feelings of guilt may exist in innocent people and false statements do not necessarily reflect actual guilt of particular crimes. It is up to you to decide if there is proof of false statements or acts of concealment and if so whether they show a consciousness of guilt concerning the crimes charged here. If these facts are proven, you must decide what weight or significance to give them.

DiMasi first argues that the district court erred in denying his request for a so-called Anderson-Munson limiting instruction that would have cabined the jury's consideration of such evidence to the individual whose statement or actions were in dispute. See Anderson v. United States, 417 U.S. 211 (1974); United States v. Munson, 819 F.2d 337 (1st Cir. 1987). We reject the argument for the fundamental reason that DiMasi fails to

explain how this instruction would apply in this case, since the statements at issue were made by him.[13]

Aside from the instruction, DiMasi argues that the statements were inadmissible because the government's case lacked a sufficient foundation of extrinsic evidence to support an inference of guilt of the crimes with which he was charged. He draws this requirement from cases involving flight evidence. See, e.g., United States v. Otero-Méndez, 273 F.3d 46, 53 (1st Cir. 2001). But to the extent that such a requirement may apply here, we refer back to our discussion of the sufficiency of the evidence and find a sufficient predicate to support the inference. DiMasi further argues that his statements to Guarino and Calia were "possibly overly narrow, but literally true." This argument misses the mark, as the jury was instructed to determine first the falsity of the statements before determining what, if any, weight to give them. By acknowledging that he was at least being cagey with his close associates, DiMasi essentially concedes, as he must, that the matter was worthy of the jury's consideration.

Regarding the comments to Topazio about the check register, even if, as DiMasi points out, Topazio said he thought DiMasi was being sarcastic, not literal, the jury was fully capable of assessing the import of the comment. And while there are

---

[13] The government argues that this shortcoming constitutes waiver. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Regardless of the reason, it is a fatal defect.

-44-

multiple possible interpretations of DiMasi's request that Topazio add the client names, we believe that the jury instructions ameliorated any possibility of improper use of the testimony.

D.  Sentencing

DiMasi was sentenced to ninety-six months' imprisonment, and McDonough received an eighty-four month sentence.  Both men challenge the substantive reasonableness of their sentences.[14]  We review the sentences for abuse of discretion, taking into account the totality of the circumstances.  United States v. Zavala-Martí, 715 F.3d 44, 50 (1st Cir. 2013).  "When it comes to substantive reasonableness, 'a sentencing court's ultimate responsibility is to articulate a plausible rationale and arrive at a sensible result.'" Rodriguez-Reyes, 714 F.3d at 11 (quoting United States v. Carrasco-de-Jesús, 589 F.3d 22, 30 (1st Cir. 2009)).  The appellants face a heavy burden to "adduce fairly powerful mitigating reasons and persuade us that the district court was unreasonable in balancing pros and cons despite the latitude implicit in saying that a sentence must be 'reasonable.'"  United States v. Madera-Ortiz, 637 F.3d 26, 30 (1st Cir. 2011).

---

[14]  DiMasi's Sentencing Guideline range was 235 to 293 months; McDonough's totaled 188 to 235 months.  The calculation for each was identical, save for the application of a lower base offense level to McDonough because he was not a public official.  We include this information for context, as neither appellant challenges his respective Guidelines calculation.  DiMasi and McDonough had requested sentences of 36 and 24 months, respectively, while the government sought sentences of 151 and 120 months.

## 1.  DiMasi

Although his arguments contain scant detail, DiMasi asserts several basic points.  First, he argues that his eight-year prison term is a significant increase over other sentences imposed in the District of Massachusetts for what he describes as "similar crimes."[15]  Relatedly, he argues that Lally's 18-month sentence is evidence that DiMasi was punished for going to trial.  Neither argument persuades us.  As to the first, we have observed that consideration of sentencing disparity primarily targets disparities among defendants nationally.  United States v. Dávila-Gonzalez, 595 F.3d 42, 49-50 (1st Cir. 2010).  As to the second, the fact that Lally pleaded guilty and testified in accordance with a negotiated agreement places the two men in distinctly different legal postures.  Id. at 50; see also United States v. Rodríguez-Lozada, 558 F.3d 29, 45 (1st Cir. 2009) (observing that a "material difference" between defendants who plead guilty pursuant to a plea agreement and those who do not undercuts a claim of sentencing disparity).

DiMasi also argues that he was punished for post-verdict public statements expressing his disagreement with the verdict

---

[15]  Sentencing disparity is a factor a district court is to consider under 18 U.S.C. § 3553(a).  Ordinarily, section 3553 factors are part of the analysis for claims of procedural error. See, e.g., United States v. Flores-Machiote, 706 F.3d 16, 20 (1st Cir. 2013).  Even though DiMasi has eschewed any claim of procedural error here, we will consider the issue to the extent that it bears on the reasonableness of his sentence.

against him.  But as the district court explained, DiMasi's protestations of innocence had no bearing on the sentence. Instead, the court noted DiMasi's insistence that his conduct was permitted by state law, a claim that the district court permissibly found had "nothing to do" with the crimes for which he was convicted, and which, the court observed, demonstrated that DiMasi did not appreciate the gravity of his conduct.

Next, DiMasi argues that the district court impermissibly considered the fact that he was the third consecutive Massachusetts House speaker to be convicted of a federal crime.  In the context of deterrence, however, the district court observed that the shorter sentences received by his predecessors might have actually emboldened DiMasi.  The court also referred specifically to Providence, Rhode Island Mayor Vincent "Buddy" Cianci, who received a five-year sentence after an extortion conviction.  See United States v. Cianci, 378 F.3d 71 (1st Cir. 2004).[16]  The district court observed that both DiMasi and McDonough were likely aware of Cianci's sentence but were apparently undeterred, a consideration that in the court's view called for a "materially higher sentence." Indeed, the district court indicated that it thought that the government's twelve-and-a-half year recommendation was reasonable,

---

[16]  The court also considered, inter alia, the six-and-a-half year sentence given to former Illinois Governor George Ryan, and the nine-year sentence meted out to former Bridgeport, Connecticut Mayor Joseph Ganim.  See Ganim, 510 F.3d at 136.

but concluded that eight years was more in line with prior public corruption sentences elsewhere. We see no abuse of discretion in either the district court's approach or its sentence.[17]

2. McDonough

McDonough's sole sentencing argument repeats the disparity claim as it relates to Lally's sentence. For the same reasons that we rejected the argument as advanced by DiMasi, we reject it here.

### III. CONCLUSION

The issues presented at trial and on appeal were myriad and complex. The evidence was sufficient to support the appellants' convictions. The district court ably dispatched the evidentiary, instructional and sentencing issues well within the latitude properly afforded trial judges. Accordingly, the appellants' convictions and sentences are **affirmed**.

---

[17] On appeal, DiMasi asserts that "all the harsh sentences in the world will not deter conduct state legislators think lawful." We agree with the district court's outright rejection of a similar argument made below, noting that there are no state laws that allow officials to take bribes, and that DiMasi's behavior, "from start to end, showed that he knew" his actions were illegal.